# CROCKER & WIFE *vs.* CLEMENTS' ADM'R.

1. Under the act of February 5, 1846, an attachment lies against husband and wife, non-residents, to subject the wife's separate estate, secured to her by ante-nuptial contract, to the satisfaction of a debt contracted by her *dum sola.*
2. Where the legal and equitable remedies by attachment are concurrent, the statute of limitations is the same in both forums.
3. When a person receives money under a decree which is afterwards reversed on error, the statute of limitations commences to run in his favor from the reversal.
4. In making an application of the legal statute of limitations, the Courts of Chancery also adopt and give effect to the exceptions and qualifications of the statute.
5. To effect the bar created by the statute, the defendant must have resided within the State during the whole period prescribed by it, but it is not necessary that his residence should have been continuous.
6. Where a decree is reversed on error after the money has been collected under it, and the suit is subsequently dismissed for want of prosecution in the court below, the defendant in the decree is *prima facie* entitled to recover back the money, and the burden of proving an equitable right to retain it is cast on the plaintiff.
7. When an answer in chancery is used as evidence by the complainant, in an action at law subsequently instituted, the whole answer, so far as it is pertinent to the issue, must be taken together, whether its allegations are strictly responsive or set up affirmative matter in avoidance.
8. When suit is brought to recover back money paid on a decree, which was afterwards reversed on error because the allegations and proof did not correspond, the defendant can derive no benefit from the master's report in the cause, although no exceptions were taken to it; the report falls to the ground with the decree.
9. The Courts of Chancery allow interest whenever it would have been recoverable at law.

ERROR to the Chancery Court of Mobile.

Heard before the Hon. J. W. LESESNE.

This proceeding was commenced on the 16th May, 1851, by bill in equity, filed by Henry W. Clements, administrator of Joshua Clements, and after his removal from the office of administrator, revived in the name of Thos. T. Bolling, the administrator *de bonis non*, against the plaintiffs in error, on the 24th day of November, 1851. The case substantially made by

the record is, that Mary E., the wife of Crocker, then Mary E Kellogg, in 1830, while sole and under age, exhibited her bill by her next friend in the chancery side of the Circuit Court of Mobile County, against Joshua Clements, the intestate of the defendant in error, for an account and recovery of the profits, &c., of certain mills and lands claimed to be jointly owned by Theron Kellogg and said Clements, but exclusively occupied by said Clements. The complainant averred that she was the only heir of said Theron, and as such entitled to the share of the profits to which he would have been entitled; that on the 17th day of January, 1839, a decree was rendered in her favor for $9,178$\frac{56}{100}$. On the 8th June, 1839, an execution issued upon this decree, and was levied on five slaves as the property of the intestate, which were sold the 8th day of August of that year for $2625, which was paid to the complainant.

After this payment, in January, 1840, this decree was reversed by the Supreme Court, and the cause having been remanded, was shortly afterwards dismissed for want of prosecution in the primary court.

In 1840 the said Mary E. married the said Henry W. Crocker, and before their marriage they entered into a marriage contract by which, the bill charges, her husband became vested with the legal title to her property both real and personal, for the sole and separate use and benefit of said Mary.

It is charged that said Crocker and wife reside without the limits of this State, and an attachment in chancery was prayed and obtained. The complainant insists that Kellogg had no interest in the premises, and no right to the money thus recovered, and prays that it may be decreed to him as administrator, &c.

The answer of Crocker and wife admits the facts charged, except that they deny the allegations as to Theron Kellogg's interest; they insist, on the contrary, that he was either a joint owner of the premises with Joshua Clements, or owned the entire interest; that the reversal of the decree by the Supreme Court was upon technical grounds, and that they are entitled, *ex æquo et bono*, to retain the sum so received in part execution of the decree, notwithstanding the reversal. They further rely upon the statute of limitations, as having perfected a bar to the claimant's demand, and insist upon several grounds of demurrer, viz., 1st. That the bill contains no equity; 2nd. That

35

complainants' remedy is adequate at law ; and 3rd. Because no foundation is laid by the bill for the process of attachment.

Several witnesses were examined on each side, and the depositions of two excluded against defendants, but as their testimony is substantially set out in the opinion, it is not deemed necessary here to state it.

Upon the hearing the Chancellor decreed a reference to the master, to ascertain the amount paid under the execution against Clements' estate, which was reported at $2,600 80, and the interest $2,635 80, making the total $5,236 60, and for this sum he confirmed the report, and ordered that, unless it was paid in thirty days from that period, the register of the court " sell the separate estate of the said defendant, Mary E. Crocker, as set forth and described in the marriage contract attached to the original bill in the cause, or so much thereof as should be sufficient to pay and satisfy said debt and costs."

To reverse this decree, the defendants below sue out this writ of error, and here assign as grounds for annulling it :

1st. That the court erred in decreeing that the defendants should pay the amount reported into court, or that the register should sell the separate estate of Mrs. Crocker as set forth in the marriage contract, for debt and costs;

2nd. In not dismissing complainants' bill at the hearing ;

3rd. In entertaining said bill or taking any proceedings, as it had no jurisdiction of the claim sought to be asserted ;

4th. In over ruling the demurrers to the original, amended, and bill of review ;

5th. In holding that the proceedings were warranted by the statute and the rules of equity pleading ;

6th. In excluding the depositions of Garrow and Tatum ;

7th. In allowing interest ;

8th. In referring the matters of account to the master, and in confirming his report ; and

9th. In not decreeing for the defendants below, and each of them, on the merits.

Geo. N. Stewart, for plaintiffs in error :

1. The bill is demurrable, because the demand is not an equitable one, but a legal demand for money had and received, suable and recoverable at law, whether due by the husband alone or

by husband and wife, and whether the defendants are residents or non-residents.—5 Stew. & P. 119; 7 Ala. R. 484; 18 *ib.* 405; 21 *ib.* 340; 6 Cowen 287; 1 H. & John. 405. The non-residence of the defendants cannot give chancery jurisdiction; an attachment at law would lie as well, as the claim is an ascertained demand for a sum certain.

It is said that it is necessary to go into chancery to reach the separate estate of the wife in the hands of the husband as trustee. We deny that the wife's separate estate is liable at all to this demand. The debt being a simple debt, due by implication by the wife before her marriage, the effect of her marriage was, to merge her existence in that of her husband; it became his debt, and no longer hers. It is true, the suit would have to be brought against husband and wife, because, if not collected of him during the coverture, it might survive against the wife; but that does not alter the case pending the coverture : it was the sole debt of the husband, and still is, if a debt at all.—See Forrest v. Robinson, 4 Porter 44; Clancy on Husband and Wife, 331 to 346. The bill is defective in its allegations; there is no averment that any judgment was recovered against the husband, nor that he is insolvent, nor that he had not property in the State sufficient to pay the debt.

2. The bill was not filed in due time. The defendants' retainer of the money has been acquiesced in between eleven and twelve years. The claim now comes too late, even if there were an express promise and an acknowledged debt. Unless the bill shows that the demand is prosecuted in due time, it is objectionable on demurrer.—Angell on Limitations 320. The case cannot be assimilated to a debt acknowledged to be due, or promised to be paid. It is true the decree was reversed; but the reversal was on mere technical grounds, not affecting the merits of the demand. The master's report on the reference, showing the amount due to complainant, stood unimpeached, and if the pleadings had been proper, the decree would have stood. The only defence set up by Clements to the bill, was, that Theron Kellogg had conveyed the land to him; he did not even aver that the land was his at the time of Kellogg's death. This defence he utterly failed to prove, and it never has been established. The amount recovered under the decree was less than the complainant claimed. It may have been wise policy in the

defendant to acquiesce in her retaining what she had got, rather than renew the controversy at the risk of losing more. The retainer was under a claim of right; no demand was made after the reversal, and no denial of that right. The claim is now made, after Clements' estate has been fully distributed, after the complainant's claim against him has been barred by the statute of limitations, and after her witnesses are dead. While she retained the money, claiming a right of retainer, she could not sue for and recover it again. The acquiescence for six years, as it was a legal demand, made it hers. Her right of action during that time, while she was in possession, was extinct.

3. The claim is barred by limitation, so far as this particular action is concerned. The bill was filed more than six years after the cause of action accrued. The complainant charges that the defendants left the State in 1842, but he files his bill against them, as non-residents, more than six years after that time. The process could have been sued out against them, as such non-residents, as well in 1842 as in 1851, and every day during the intermediate time. In chancery there is no positive bar by statute; but chancery holds claims barred by analogy to the statute governing them at law. It is the policy of the statute—the reason of the law—that governs courts of chancery. The reason of the statute of limitations operates on complainants, not defendants: it is to require claims to be prosecuted before the proof is lost or difficult. The exception as to absent defendants is allowed because the plaintiff could not sue during such absence. But that reason does not hold here, as the complainant might have sued out this process every day during the six years. *Cessante ratione, cessat etiam lex.* If this demand had been sued at law, it would have been barred; it is equally barred here, because the law will not allow a money demand to be prosecuted, in any form of action, after the lapse of six years, when it might have been prosecuted every day during that time. It cannot be contended, that if a debtor absents himself from the State, leaving property to be seized, this property is never protected from suit. What is the limitation to such an action? These are the very cases which should be rigorously watched, as they are most liable to be abused.

4. The objection of the statute of limitations arises in anoth-

er form, upon the facts disclosed by the bill, answer and proof. Mrs. Crocker left the State in January, 1845, returned in November, 1848, but was in Mobile four or five months during the intermediate period, and left again in June, 1849. Whether she was in the State full six years, depends on the manner of counting the months : excluding both months named, the full period had not elapsed ; but including them, it is complete.— How is the statute to be construed concerning absent periods ? The successive periods of absence cannot be added together cumulatively to make the period of residence less than six years. The construction as to exceptions in the statute has always been very rigid, when the statute has once commenced to run.—See Cole v. Jessup, 2 Barb. S. C. R. 313 to 315 ; Randall v. Wilkins, 4 Denio 577. Only the first period of absence can be counted against us, and consequently the bill is barred as to Mrs. Crocker ; and when a bill, filed against two jointly, is barred as to one, it cannot be maintained at all, for a joint cause of action must be shown to exist.

5. The decree was erroneous on the merits of the case. The bill alleges that the defendants have no legal or equitable right to retain the money sued for, and without this allegation it would be defective. The answer positively denies the allegation, and asserts an equitable right of retainer. It is insisted that the evidence sustains the answer, and makes out a complete defence. (Mr. Stewart's argument on the testimony is necessarily omitted, as it could not be condensed within the compass of a brief.)

6. Interest ought not to have been allowed, as there was no demand after the reversal of the decree. While the money was retained, the defendant in error was protected from an action for the same debt. The reversal being on a technical defect, until this condition of things was determined by a demand or suit, the parties stood mutually consenting. The complainant cannot, after eleven years' acquiescence in our possession of the money, for which he had all the time a corresponding protection from suit, and when our suit is now barred by limitation, be allowed to come and elect to claim the money and interest during the long period of delay. It was in the power of complainant to disavow our claim to retain the money in satisfaction, *pro tanto*, of our demand. Until demand or suit, no election is made, no

default exists, no interest accrues. The mere delay in this case, under the circumstances, is sufficient to prevent the allowance of interest by a court of chancery.

J. C. BOLLING, *contra:*

1. The statute of the State makes all equitable titles to land subject to the payment of debts, by process in a court of chancery.—Clay's Digest 350 § 31 ; and the act of 1846, giving attachments in chancery, authorizes the mode of proceeding adopted in this case. It was not necessary to exhaust our remedy against the husband, before proceeding against the wife.—17 Ala. 787.

2. The statute of limitations is no bar to the suit, as the husband, who was the party liable to be sued at law, has been absent from the State.—Smith v. Bond's Heirs, 8 Ala. 386. Nor can the time of the wife's return to the State be computed, so as to make six years, because the time is stated in the amended answer in the alternative, and if either party is to be prejudiced by such a mode of statement, it must be the party who pleads in that way. Besides, the defendant, if he relies on an exception, in order to make out his technical bar, must state the facts and circumstances with clearness and distinctness.— Angell on Limitations 320, and authorities there cited. Courts of equity only apply the statute when the party would be barred at law.—*Ib.* 25, 26.

3. The money cannot be retained, unless the defendants show an ascertained and liquidated demand. Their right, as set forth in the answer, if any such ever existed, is a mere right to call us to an account, to do which, they must become actors in a suit for that purpose : they cannot, in this suit, ascertain what may be due them, and apply the money which they have unjustly recovered to its payment.—1 B. & A. 664 ; 7 Ala. 307 ; *ib.* 484.

4. The amount we sue for is not an open account.—8 Porter 230 ; 1 Ala. 63 ; 10 Wend. 354.

5. We have been in the adverse and exclusive possession of the land for more than thirty years. If they were tenants in common with us, their right would be barred in twenty years, and they could not call us to an account for more than six years back.—4 Yerger 104 ; Angell on Limitations 465, 466.

6. The decision of the court below on the merits was correct.

7. The court will bear in mind, that it is the separate estate of the wife, secured to her through a trustee; that the money was received by her while a *feme sole ;* and that, without the aid of the statute, we would be allowed to proceed as we have done, as the wife's separate estate could not be reached by any process at law.—10 Ala. 291.

8. The mortgages to Clements and to Kennedy were properly admitted in evidence, as they are explanatory of Clements' possession and the character in which he held the lands.—1 Green. Ev. § 109; Angell on Limitations 464 to 466.

CHILTON, C. J.—1. We shall first examine the questions raised upon the demurrer to the bill. It is insisted that the demand sought to be recovered is legal merely, and constitutes no charge upon the separate estate of Mrs. Crocker, but is recoverable at law, by suit against husband and wife, out of the effects of the husband; that, being the debt of Mrs. Crocker *dum sola,* it became the debt of her husband upon the marriage, and no longer hers, and that it therefore constitutes no charge upon the estate which is secured to her sole and separate use by the marriage contract. It is further contended that the liability of the wife, if any exists, is only an implied undertaking to refund the money which she has received, and that no equity attaches in virtue of such liability upon her separate estate.

In England, there appears to have been some contrariety of decision upon the question as to what kind of pecuniary engagements on the part of the wife shall be considered as amounting to an appointment of her separate property for its satisfaction; but, with respect to demands arising under circumstances from which the law would imply a contract, it seems to be well settled that they do not attach upon her separate estate.—Bolton v. Williams, 2 Ves. Jr. 150; Jones v. Harris, 9 *ib.* 486; Aguilar v. Aguilar, 5 Madd. 414; 2 Roper's H. & W. marg. p. 241 n. a.; *ib.* 22, Law Lib. top p. 1434; Clancy's Rights of Married Women 331 to 346. The same doctrine seems to be countenanced by this court in Forrest v. Robinson, 4 Por. 44. Conceding, however, such to be the law in this country, we do not think the principle applies to the case before us. This property was subject to this demand before the marriage con-

tract was entered into, and the effect of the contract is, to reserve the property to the wife, or, in other words, to exclude the marital rights of the husband, and prevent them from attaching to it.

Although the claims of creditors are never considered an objection to the execution of marriage articles, unless they are creditors by judgment or other matter of record, so as to constitute a lien upon the property before the articles were entered into, and notwithstanding marriage is in law deemed a valuable consideration to support such ante-nuptial contract, nevertheless, when the debtor makes the settlement in anticipation of marriage, or declares a trust, not for the benefit of another, but in her own favor, and to her sole and separate use, she retains it after the marriage, in the view of a court of equity, as though she were sole. It is unaffected by the marriage, and must be considered liable to her previous debts.

True, the husband, upon the marriage, by the common law, became immediately bound for the debts of the wife, whatever might be their amount, and this irrespective of whether he obtained any property by her or not : he is said to have adopted her and her circumstances together.—1 Bla. Com. 443; but, although he becomes charged with her debts, the wife is not by the marriage released from them. The coverture protected her from personal execution, but this protection was afforded only in cases where she has no separate estate.

It appears to be well settled by the authorities, that aside from the statutes exempting the person of the wife from arrest, upon civil demands, both she and her husband might be taken in execution, and when so taken, she was not entitled to her discharge, unless it was made to appear to the court that she had no separate property out of which the demand could be satisfied.—Tidd's Pr. (9 Ed.) p. 1026; McQueen H. & W. 40 ; Sparks v. Bell, 8 B. & C. 1. These authorities show, that, even at common law, the separate property of the wife was made liable to satisfy her prior debts, in cases where it was in the power of that court to reach it. But our statute, exempting the wife from imprisonment for debt, effectually takes away the power of the common law forum thus to afford relief.

The remedy here pursued is, however, clearly given by the act of 5th Feb. 1846, (Pamp. Acts '45—6, p. 17,) authorizing

a bill in chancery against non-resident debtors, upon simple contract demands, to subject either a legal or equitable interest in real or personal estate, to the payment of such demands, upon making affidavit as to the facts of indebtedness and non-residence of the defendants; and the sheriff is to be authorized by process, in the nature of attachment, to take into his possession personal property of the defendants, repleviable on security, in such manner as the judge granting it may direct, sufficient to satisfy the claim. The required affidavit accompanies the bill in the case before us.

As this act confers the remedy, and the effect of the marriage settlement is not such as to exempt the property which the wife reserves to her sole and separate use from liability to demands existing against her when the settlement was made, it follows that the plaintiff is entitled to the relief which he seeks, unless he should be defeated upon some other ground. We therefore turn to the second objection to the granting of relief, which is—

2. That the bill was not filed in due time, and that the retainer of the money has been acquiesced in too long to be disturbed at this late period.

Before proceeding to consider the facts, we premise first, that the remedy here pursued being concurrent with the legal process of attachment, the same limitation which would have been applied had the suit been commenced in the common law forum, should be applied in equity. This is a familiar doctrine.—2 Story's Eq. Jurisp. § 1520; Angell on Lim. 25—6.

In the next place, we premise that the action in the case before us accrued, if at all, upon the reversal of the decree by the Supreme Court, under which the money was collected by Mrs. Crocker; for until the decree was annulled, she had a right to the money which she had collected under it, and no action could have been maintained against her for its recovery.— In the third place, we feel constrained, in making an application of the legal statute of limitations, to carry out the analogy which obtains between this and the common law court, as to the exceptions and qualifications with which it would have been applied in the latter forum; for we should violate the spirit of the statute just as much by making an application of it without these, as to refuse to regard it at all.—Demarest v. Wynkoop, 3 John's Ch. R. 129; Angell on Lim. 27. We must, there-

fore, exclude from the computation the time the defendants were absent from the State, as the statute requires that "the time of such persons' absence shall not be accounted, or taken as part of the time limited by this act."—Clay's Digest 327, § 84. Under this clause of the statute, it has been decided by this court, and we think correctly, that the debtor must have been within this State, subject to be sued, during the whole period prescribed. as a bar, but that this need not have been continuous. He may add together the different portions of time, so as to complete the period fixed by the statute.—Smith, adm'r, v. The Heirs of Bond, 8 Ala. 386. Applying these principles to the case before us, we have but little difficulty in arriving at a correct conclusion. The bill was filed on the 16th May, 1851, and the decree of Mrs. Crocker, then Miss Kellogg, against the administrator of Clements, was rendered at the January term of the Supreme Court, say the 1st of January, 1840. She left the State in January, and her husband in March, 1845, and she returned and remained in it four or five months after that time; so that they could not have been in this State more than five years and eight or nine months, from the time the cause of action accrued.

But the bar is not made out, even dating the cause of action from the time when the sheriff collected the money—the 8th of August, 1849—unless we say that Mrs. Crocker, when she returned, remained *five* months. She says she remained *four or five*, and stating the time in the alternative, her answer must be taken most strongly against her. We must, therefore, take the shorter period of four months, in the absence of proof of any longer time. In either aspect, therefore, the plaintiffs in error can derive no benefit from the statute of limitations.

But it is argued, that the plaintiffs in error are barred from again renewing the suit against Clements' estate, and although the statute of limitations may not in strictness protect them, yet a court of equity will regard the delay in bringing this suit as an acquiescence in the demand, on the part of Clements' administrator, at least to the extent of this payment. We need only say, in reply to this argument, that the want of mutuality in the bar is the result of the voluntary non-residence or absence from the State of the plaintiffs in error, by which they bring themselves within the exceptions contained in the statute;

and we are aware of no rule of equity which would justify us in refusing relief, by reason of delay, in such a case as this, where the statute of limitations would not constitute a bar, had the remedy been sought at law instead of in this court. Neither have we seen any case which takes a distinction between implied. and express promises to pay money, as respects the application of the statute.

But we have said enough upon this point, and proceed to consider the case upon the merits. We agree with the Chancellor, in holding that the reversal of the decree which Miss Kellogg had obtained against Clements' administrator, rendered it null and void, and this, with the subsequent abandonment of the suit, whereby it was dismissed for want of prosecution, entitled the administrator of Clements, *prima facie*, to recover back the money which had been collected in virtue of such decree, and clearly casts upon the plaintiffs in error the burthen of showing an equitable right to retain it, notwithstanding such reversal and subsequent dismissal of the bill for want of prosecution. It is true, the reversal was had upon technical grounds; but the decree was nevertheless annulled, and if the complainant had a meritorious ground of complaint, that should have been shown when the cause was remanded in the primary court; but it was not done, and the prosecution was abandoned. This, *prima facie*, concedes that nothing was due, and, as we have said, devolves on the plaintiffs in error the necessity of showing the right of retainer.

The counsel for the plaintiffs in error relies upon the fact, that Clements, in his answer to the original suit, admitted that Kellogg had at one time a joint interest in the land, but set up, by way of avoidance, that he had sold and conveyed the land to him, Clements, for $2500, by deed of conveyance bearing date the 9th of Dec., 1816, which deed he proposed to exhibit, &c. It is said this deed was neither then shown, nor has it ever come to light since; and it is insisted that, inasmuch as Clements' answer set it up as affirmative matter in avoidance, it was incumbent on the defendant in that case to sustain it by proof.— Now, conceding that this position would have been correct, if taken in that case, we do not think it applies to this; for here, the parties are reversed. We are not called upon to try that case, and determine the effect of the answer of Clements, a

subserving the double purpose of pleading and proof. In this case, we are to consider it as proof merely, and thus considering it, so far as its allegations are pertinent to the matters in issue, they must be regarded as proof, whether strictly responsive or affirmative merely. In other words, if the plaintiffs in error desire to make it proof, the whole answer, if pertinent, must be taken together.—See Saltmarsh v. Bower & Co., 22 Ala. 221, and cases there cited.

The complainant in the court below, upon the production of the record of the decree, its reversal, and the abandonment of the suit by Miss Kellogg, and proof of her receipt of the money, made out a *prima facie* case, and satisfied the averment in the amended bill, that the defendants had no right to retain the sum so received. If the defendants had the right of retainer, this being an affirmative fact, and within the knowledge of the defendants, it was incumbent on them to set up such right in their answer, and sustain it by proof. They have averred it, but have they proved it? We give them the benefit of the position taken by their counsel, that after the lapse of so long a period, they should not be held to such strict proof of their right as would be required under other circumstances; and we will further give them the benefit of the evidence which the Chancellor excluded; and considering the case in the most favorable light for them, we think the record fails entirely to establish in them an equitable right to retain the money.

This brings us to a consideration of the proof taken in the cause, and which is subtantially as follows :

For the complainant in the court below three witnesses were examined : Augustine Demmy deposes that soon after he became acquainted with Joshua Clements, in 1814, the latter removed from Mobile to the middle fork of Dog River, called Grand Bayou, where he was erecting a mill called Clements' Mill ; that before its completion, Clements took Kellogg into copartnership with him, and they finished it together, and became part owners of the mill and land belonging to it, which was called the mill tract, under the firm of Clements & Kellogg ; that some years after the mill went into operation Clements bought Kellogg out, the firm was dissolved, and Clements became the sole possessor of the mill and mill tract, which comprised about twelve hundred acres ; that said Clements continued to occupy the premises unin-

terruptedly, down to the period of his death, with the exception of two years, when he had conveyed to Johnson and Beardsley, but after said conveyance he became re-possessed, and died in the possession, and his heirs have since occupied it. He does not recollect the time when Clements bought of Kellogg, but says it was notorious that he did purchase his entire interest. Witness never saw any deed conveying such interest, but lived where they had the mill, was intimate with both Clements and Kellogg, and heard them both talk over their business together.

William Grelat testifies, that Joshua Clements removed upon the premises and commenced the erection of the mill some three years after the close of the late war with England; that he claimed the premises in his own right; that he occupied the same until his death, and that Kellogg, from whom he claimed to have purchased the premises, lived on some land adjoining the mill tract, down to the period of his death, but witness does not know whether he claimed to own it or not; never heard any one make claim to the mill but Joshua Clements.

Graham Davenport testifies, that he became acquainted with Clements in 1818; he was then residing in the vicinity of Mobile; purchased lumber from Clements, though he never was at the mill, which was known as Clements' Mill; remembers that Clements and Kellogg were in co-partnership in the mill, but does not know whether Kellogg had any right or title to the land; the partnership was dissolved; Kellogg left Clements, and died. Witness does not know whether Clements purchased out Kellogg or not.

On the part of the defendants in the court below, Mrs. Ogden testifies as to their residence for several years past, but says nothing respecting the merits of the controversy.

The deposition of S. H. Garrow was taken in the case of Miss Kellogg against Clements, and was excluded by the Chancellor. This witness testified, that Kellogg died in 1820, and was at the time of his death the owner and occupant of a tract of land in Mobile County with a mill situated thereon, on Dog River, about nine or ten miles from Mobile, and containing six hundred and forty acres; that at one time it was owned by Clements and Kellogg, and the latter sold his share to Clements, but afterwards re-purchased the whole tract back from Clements. The witness states, that he obtained a knowledge of these

facts from conversations with both Clements and Kellogg. He further states, that the land and mill were afterwards sold by him, the witness, as administrator of Kellogg, under an order of the Orphans' Court, and Clements became the purchaser, but refused to complete the purchase, because Mrs. Kellogg would not relinquish her dower ; that Clements occupied the land, and used the timber making lumber, from 1824 until the period of his death, which happened in 1833.

The witness, Tatum, whose testimony as taken in the original cause the Chancellor also excluded, merely proves, that Clements occupied the premises and used the mill from the time Kellogg died until he, Clements, died, and thinks that the annual net income of the mill should have been twelve hundred dollars.

Two deeds of mortgage were introduced by the complainant in the court below, one dated 23d May, 1821, signed by Joshua Clements, Ebenezer Johnson and Cyrus Beardsley, to Joshua Kennedy, to secure the payment to the latter of $2,794, due one year after the date of said deed, and in which mortgage it is recited. The land is described as situate on Dog River, and containing six thousand four hundred arpents, and was granted to George Tucker by the Spanish Government, by him conveyed to Joshua Kennedy, and by the latter to Clements and Kellogg. The other deed bears date the 5th November, 1821, and is made by Ebenezer Johnson and Cyrus Beardsley to Joshua Clements, for one undivided moiety of the same land, in which it is recited that said land is the same conveyed by Joshua Kennedy to Joshua Clements and Theron Kellogg in 1814, and the undivided half of which was since sold by the said Kellogg to said Clements, and since, viz., on the 17th January, 1820, sold by said Kennedy to said mortgagors. This deed was made to secure the payment of $5000 in yearly installments of one thousand dollars each year, the first to fall due the 17th January, 1821, and further to secure the payment of one half of a certain note given by Clements and Kellogg to Joshua Kennedy, as the purchase money for said lands, and to pay one half the costs and charges of what the parties might thereafter have to pay in the event the United States should refuse to confirm their title and the land should be sold.

The defendants below read the deposition of W. Ogden, who deposes, that he learned from conversations with Clements and

Kellogg that they used and occupied the mill until 1820, claiming the same as owners ; that Kellogg died in August, 1820, and Clements continued to use said mill until his death, in 1832 or 1833 ; and that in his opinion the net yearly value was about $500.

This is a synopsis of all the evidence in the cause, and we think that it is needless to comment upon it ; for it is very certain that it furnishes no data for a satisfactory conclusion that the defendants have a right to retain this fund.   It is said that much of the testimony is illegal and secondary ; and this is true, but the objection goes to the testimony on both sides.   Concede that the mortgages were improperly admitted, and that the testimony of Grelat is but the declarations of Clements himself, which are not legal evidence, the testimony of the defendants, showing an *ownership* in land and a sale by an order of court by parol evidence merely, is liable to the like objection.   Aside, however, from this, and waiving the objection to the testimony of Garrow, as not being relevant to the issue made by Miss Kellogg's bill, the most that can be said of it, when taken together, or of that portion of it which is legal, is, that it shows that Kellogg at one time had some interest in the possession of the mill and claim of ownership as a copartner with Clements. This copartnership in the mill was dissolved, but as to the respective rights of the parties, as growing out of the *title* to the land, neither of them has shown any title, unless, indeed, the continued possession of Clements and those claiming under him has ripened their claim into a title by virtue of the statute of limitations.   The only documentary evidence of title is the copies of the mortgages ; and if the recitals in these are relied upon to show that the land once belonged to Clements and Kellogg, the same recitals, which must be taken all together, show that the latter (Kellogg) sold out his interest to Clements. As the defendants below insisted on their title, as conferring the right of retainer of the fund received, they should have produced some evidence of it, before the complainant could be required to produce his title and thus to negative the idea of the title being in them or their ancestor.   Upon a careful examination and consideration of the proof, we are led to the conclusion that it does not uphold the claim set up by the plaintiffs in error to retain this fund.

The counsel for the plaintiffs in error endeavors to strengthen his case, by relying upon the report of the master made in the case of Miss Kellogg v. Clements, to which no exception was taken; but this cannot be looked to, as affecting the merits of this controversy. The defendant (Clements) might well have reposed upon the objection which proved fatal to the complainant's case, that there was no proof of the allegations of the bill, and have suffered the complainant to proceed *ex parte* as to the reference of the matters of account. Having shown no equity or title to relief, as alleged in the bill, the complainant gained nothing by taking the account, as the report and confirmation of it fell to the ground with the decree, upon the general reversal.

4. Upon the subject of interest we think there was no error. Courts of chancery upon this, as upon the subject of the application of the statute of limitations, follow the law, and allow interest in cases where it would have been recoverable had the suit been instituted in the common law court.—See Hughes' Adm'r v. Standeford's Adm'r, 3 Dana's R. 288, and cases cited; 2 Danl. Ch. Pr. 1440-1. The sum to be refunded in this case was certain, and the law implied a contract or raised a promise to pay it. In such case interest is properly allowed.—2 Danl. Ch. Pr. 1441, n. c ; 19 Ala. Rep. 468.

There is no error in the record, and the decree is consequently affirmed.