# CHARLESTON.

## AUGUST v. GILMER.

Submitted January 19, 1903.　Decided April 4, 1903.

| | |
|---|---|
| 53 | 65 |
| f64 | 72 |
| 65 | 625 |

1. SUSPENDING BOND—*Property.*

   The delivery to the sheriff of a suspending bond, as provided in section 4 of chapter 107 of the Code, by a claimant of property levied upon under a *fieri facias, ipso facto* stays the execution, and a sale of the property thereunder, before the right of property has been determined, as provided in section 5 of said chapter, is void.　(p. 66).

2. SALE—*Title—Sheriff.*

   A purchaser at such sale acquires no title to the property, and,. after notice or upon a rule to show cause, may be summarily required to return the property to the custody of the sheriff. (p. 68).

3. ATTACHMENT—*Jurisdiction—Fieri Facias.*

   Property levied upon under a *fieri facias* is in the custody of the law, and the court has power, by attachment, punishment for contempt, and the writ of restitution, to maintain its jurisdiction against its own officers, parties and other persons.　(p. 72).

Error to Circuit Court, Greenbrier County.

Action by J. A. August, Sr., against Henry Gilmer. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

PRESTON & WALACE, for plaintiff in error.

JOHN W. HARRIS and GILMER & GILMER for defendant in error.

POFFENBARGER, JUDGE:

On a judgment in the circuit court of Greenbrier County, C. M. Harwood sued out an execution against J. A. August, Jr., returnable to July rules, 1901, which was levied by the sheriff on a horse.　J. A. August, Sr., set up a claim of title to the horse, and thereupon the sheriff demanded from the plaintiff an indemnifying bond, which was given, and then, on the 25th day of June, 1901, said claimant executed and delivered to the sheriff a suspending bond.　Two days later, June 27, 1901, the sheriff sold and delivered the horse to Henry Gilmer for one hundred

and fifty dollars. On the 2d day of July, 1901, the circuit court of the county, being in session, the claimant caused a notice to be served upon Gilmer to the effect that he, August, Sr., would move the said court on the 3rd day of July, 1901, to set aside and annul the said purchase and have the horse returned to the custody of the sheriff. To this notice Gilmer appeared specially, resisted the docketing of the motion and notice and moved to quash the notice and the return, which motions being overruled, he took his bill of exceptions. Afterwards, on the 5th day of July, 1901, August, Sr., filed his petition, setting up the proceeding on the execution and praying that Harwood and Gilmer be required to come in and litigate their claims with the petitioner. On the same day, the court declared the sale void, set it aside, ordered Gilmer to forthwith release the horse and directed the sheriff to take it into his custody.

Gilmer complains of said judgment, urging that the claimant's remedy was an action of detinue for the recovery of the horse or a suit against the sheriff, and that the proceeding amounts to a taking of his property without due process of law. As the order made shows that the court acted only upon the notice, the execution and the return thereof, the indemnifying bond and suspending bond, it is true that the judgment does not stand upon formal pleadings between the parties to the notice, but whether the order made in the proceeding requiring the sheriff to retake the horse from Gilmer, the purchaser, amounts to depriving Gilmer of his property without due process of law, depends upon the construction which the courts have put upon that clause of the constitution which prohibits it. This necessitates an inquiry concerning, first, the construction of said constitutional guaranty, and second, the jurisdiction of courts and their modes of procedure.

The constitutional guaranty referred to was not intended to either establish or perpetuate any particular form of action or mode of procedure. All that it requires is that the substantial rights of notice and hearing before judgment be preserved. 10 Am. & Eng. Ency Law, (2d ed.) 301. In *Railroad Co.* v. *Iowa,* 160 U. S. 389, Mr. Justice White said: "The Fourteenth Amendment to the Constitution in no way undertakes to control the power of a State to determine by what process legal rights may be asserted or legal obligations be enforced, provided the

method of procedure adopted for these purposes gives reasonable notice, and offords fair opportunity to be heard, before the issues are decided.  * * *  It is also equally evident, provided the form sanctioned by the state law gives notice and affords an opportunity to be heard, that the mere question of whether it was by a motion or ordinary action in no way rendered the proceeding not due process of law within the constitutional meaning of those words." The same construction has been given the phrase "due process of law" in a state constitution. "Due process of law," as the term is used in the state and federal constitutions, does not necessarily imply a hearing, by one whose property is taken or damaged for public use, according to the established practice in courts of common law or equity, but is satisfied whenever an opportunity is afforded to invoke the equal protection of the law by judicial proceedings appropriate for the purpose and adequate to secure the end and object sought to be attained." *Railroad Co.* v. *State,* 47 Neb. 549. These adjudications are in response to the claim that the established practice in courts of common law and equity, or usual modes of procedure, must be adhered to and followed. No case has been found in which it has been decided or even claimed that there is lack of due process of law when such modes are pursued. Such a contention would certainly be without reason. If the proceeding complained of here has warrant in the common law, the objection to it must fail. If it shall be found that there is an inherent power in courts, to retain within their control property over which they have acquired jurisdiction, and also the power to reclaim, in a summary manner, property which has been illegally withdrawn from the jurisdiction of the court, there is no violation of the constitutional guaranty.

"When property is lawfully taken by virtue of legal process, it is in the custody of the law." Bouv. Law Dic., title *Custodia Legis.* In *Taylor* v. *Carryl,* 20 How. (U. S.) 583, 594, Mr. Justice Campbell, speaking of the English Courts, said: "Those courts take efficient measures to maintain their control over property within their custody, and support their officers in defending it with firmness and constancy. The court of chancery does not allow the possession of its receiver, sequestrator, committee, or custodee, to be disturbed by a party, whether claiming by title paramount or under the right which they were appointed

to protect, as their possession is the possession of the court. Nor will the court allow an interfering claimant to question the validity of the orders under which possession was obtained, on the ground that they were improvidently made. The courts of law uphold the right of their officers to maintain actions to recover property withdrawn from them, and for disturbance to them in the exercise of the duties of their office." In *Hagan* v. *Lucas,* 10 Pet. (U. S.) 411, Mr. Justice McClain, speaking for the court, said, "Property once levied on remains in the custody of the law and is not liable to be taken by another execution in the hands of a different officer, and especially by an officer acting under another jurisdiction." To the same effect are *Freeman* v. *Howell,* 24 How. (U. S.) 450 ; *Buck* v. *Colbath,* 3 Wall. 334. "It is a doctrine of law too long established to require a citation of authorities, that, where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and whether its decision be correct or otherwise, its judgment, till reversed, is regarded as binding in every other court; and that, where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court." Mr. Justice Grier in *Peck* v. *Jenness.* 7 How. (U. S.) 612, 624.

These principles have direct application to this case, although their enunciation by the courts arose from causes presenting facts and conditions somewhat different from those of the present case. They put it beyond question that property levied upon by execution is in *custodia legis,* in the custody of the law, through and by the court, holding by the hand of its executive officer, acting under the process of the court. The possession of the court is good against all individuals and all other courts and their officers, and the court must necessarily have the power to vindicate and uphold its right of possession. Otherwise, its jurisdiction would fail and it would be powerless to perform its functions under the law. In the first place, the forcible and wrongful dispossession of the officer in whose custody the property is does not deprive the court of its jurisdiction. It may go on and render a binding judgment or decree. *Freeman* v. *Howell,* 24 How. 450, 457. As stated in the quotation from *Freeman* v. *Howell,* cited, "Where a court has jurisdiction, it has a right to decide every question which occurs in the cause." It is

upon this principle that a person who acquires an interest in property involved in litigation, *pendente lite,* and from a party to the suit, takes it subject to the rights of the other parties to such suit as finally adjudicated, and is concluded by the judgment or decree whether he becomes a party to the action or suit and has his day in court or not.    21 Am. & Eng. Enc. Law, (2d ed.) 395; Bart. Ch. Pr. 167; *Stout* v. *Manufacturing Co.,* 41 W. Va. 339; *Parker* v. *Clarkson,* 39 W. Va. 184; *Lynch* v. *Andrews,* 25 W. Va. 751.    "A purchaser of the land from the brother *pendente lite* need not be brought in as a party to the suit.    The law imputes notice to such purchaser, for public policy requires that this real property specifically sued for, shall abide the result of the suit; and such purchaser is as conclusively bound by the decree as if he had been a party from the beginning."    *Wilfong* v. *Johnson,* 41 W. Va. 283.    *Pendente lite* purchasers are bound by the decrees entered affecting the property so purchased by them, although they may not be parties to the suit." *Lynch* v. *Andrews,* cited.    And this applies to personal property, especially when it is in the custody of the court by attachment, receivership, or other sequestration.    21 Am. & Eng. Enc. Law, (2d ed.) 627.

But in attachment, punishment for contempt and the power of restitution, the courts have more ample, summary and heroic methods of maintaining their jurisdiction, compelling respect thereto, and enforcing the due administration of justice.    These measures are held to be absolutely necessary for the furtherance and execution of justice.    They have been long practiced and are well established as a part of the law of the land.    They are used by the courts against two classes of persons, ministers of the court, its officers and jurors, and all other persons who are guilty of contempts of the writs of the court, contempts in the face of the court, contemptuous words or writings concerning the court, contempts of the rules and awards of the court, *and abuses of the process of the court.*    Particular persons included in this last class are inferior judges, counsellors, gaolers, and any person whatsoever, guilty of the acts named.    Hawk. C. P., 206, 223. In such cases, the court may, if necessary, imprison the parties offending, and that without indictment or information, and yet the guaranty of a trial by jury is not violated.    *State* v. *Fredlock,* decided at the Fall Special Term, 1902; *Mason* v. *Bridge Co.,* 16 W. Va. 864; *State* v. *Frew,* 26 W. Va. 214; *State* v. *Mc-*

*Claugherty,* 33 W. Va. 250; Bacon's Abr., Vol. I, p. 462, says such imprisonment is no violation of the guaranty in *Magna Charta* that none shall be imprisoned *"sine judicio parium, vel per legem terrae,"* and puts it upon the grounds of the necessity of such power, and its inherency in every court of general jurisdiction.

It is impossible for a court to fully perform its functions, if it has no power to direct and control its executive officer, power to compel him to do what he is commanded to do, power to compel him to refrain from doing, under mere color of authority, what he is forbidden to do, or what he has no authority to do. Hence, he is under the control of the court through its power of attachment and punishment for contempts, for not executing its writs effectually, and for making false returns. Hawk, C. P., 207, 208. In Tidd's Pr., Vol. I, 485, it is said that these powers may be exercised by any of the English courts of general jurisdiction, against "inferior judges and officers, for acting unjustly, oppressively, or irregularly, in the execution of their duty; or for disobeying the King's writs issuing out of the Superior courts, by proceeding in a cause, after it has been put a stop to, or removed by a writ of prohibition, *certiorari, habeas corpus, supersedeas,* or error, etc.," and "fifthly, against sheriffs, or other persons having the execution of writs, for not returning them, or bringing into court the body of the defendant, etc., on being served with a rule for that purpose;" and "against gaolers, etc., on the Lord's act, for extortion or oppression," and against other persons "for contempts committed out of court; for a rescue, or contemptuous words spoken of the court, or its process." Among the contempts mentioned by Blackstone are, "Those committed by sheriffs, bailiffs, gaolers, and other officers of the court; *by abusing the process of the law, or deceiving the parties, by any acts of oppression, extortion, collusive behavior,* or culpable neglect of duty." 4 Blk. Com., 384. "Sheriffs and other officers are liable to an attachment for an oppressive or illegal practice in the execution of a writ; as using needless force, violence, or terror, treating persons under an arrest basely and inhumanly, extorting money from them, etc., or making an arrest without due authority." Bacon Abr., 463, title Attachment.

The use of these extraordinary methods is discretionary with the courts and are not usually employed except in cases of pal-

pable corruption or wilful negligence or obstinacy. *Id.* 463; 2 Hawk, C. P., 208, 209. But this argues nothing against the power and authority of the court to employ them wherever, in the discretion of the court, their use is proper. Here, it may be added that Blackstone says: "For laws, without a competent authority to secure their administration from disobedience and contempt would be vain and nugatory," and that the power referred to, results from the first principles of judicial establishments, and must be an inseparable attendant upon every superior tribunal. 4 Blk. Com. 286.

Inquiry may be made here as to the reason for the citation of all these authorities, showing that courts have the inherent power to punish for contempts, inasmuch as nobody is here appealing from a judgment in such case. The reply is, that these measures and the authority to so punish are grounded upon, and flow out of, the necessary jurisdiction and control of the court over property which forms the subject of its action and is within its jurisdiction and prove, by their very existence and their varied functions, that such plenary power to vindicate, uphold and defend their jurisdiction and compel respect to their authority is lodged in the courts. Of course, mere punishment of offenders would not always effectuate the purposes of jurisdiction, although it is often resorted to to compel the faithless officer to perform his duty. Courts have the further power to right the wrongs perpetrated by the abuse of process as well as those resulting from their own erroneous decision and actions. For this purpose, the writ of restitution, as old as the law itself, has been used. See *Simpson* v. *Juxon,* Cro. Jas. 699, where it is held that if judgment be reversed on error a writ of restitution shall be awarded. "When the thing levied upon under an execution has been sold, the price for which it is sold is to be restored." Bouv. Law. Dic., title Restitution. *Fleming* v. *Riddick,* 5 Grat. 272; *Keck* v. *Allenger,* 42 W. Va. 425; *Little* v. *Bunce,* 7 N. H. 485; *Croker* v. *Clement's Adm'r.* 23 Ala. 296. In *Duncan* v. *Kirkpatrick,* 13 S. & R. (Pa.), 292, Gibson, J., said: "In this respect, the judgment, when entered in form, is not only that the judgment of the court below be reversed, but that 'it is considered that the defendant be restored to all things which he has lost on occasion of the judgment aforesaid;' and the writ of restitution which is issued in pursuance of it, and in which the sheriff is

commanded to levy the money of the chattels of the plaintiff, or to arrest his person, is strictly an execution." This presents the theory and the ancient practice of restitution, but it seems that the writ itself in modern practice is rarely issued. Restoration is enforced by the use of other writs, but restitution, the object of the ancient writ, is thereby equally effectuated, "When the plaintiff has execution, and the money is levied and paid, and the judgment is afterwards reversed, there the party shall have restitution without a *scire facias;* because it appears on the record that the money is paid, and there is a certainty of what was lost; otherwise where it was levied but not paid, for then there must be a *scire facias,* suggesting the matter of fact, viz.: the sum levied, etc. If the judgment be set aside after execution for irregularity, there needs no *scire facias* for restitution; but if it be not made, an attachment shall be granted upon the rule for a contempt." 2 Tidd's Pr. 1073. An illustration of the use of the writ of restitution, which shows clearly its application here, is found in the old cases in which there were judgments of outlawry, where it was held that, after the reversal of the outlawry, the proceedings were regarded as having wrought no change in the title to the property taken on execution, and the defendant was always restored to the possession of the property itself, and not compelled to take the money realized from it. See 5 Coke, 183, note *c,* where it is said, "In the case of an outlawry the instant it is reversed it becomes mere waste paper, and the rights of all the parties are restored to the same situation as if no outlawry had taken place; *St. John's College* v. *Murcot,* 7 T. R. 264, and *vide Dr. Drury's case,* 8 Co. 143, and a termor upon the reversal of his outlawry shall be restored to his term, although it has been sold to the King." The sale in such case was made by the sheriff under a writ called *Capias utlagatum* and is distinguished from a sale made on an execution, upon the ground that the sheriff, in the case of a *capias utlagatum* is not bound to sell the property levied upon by him, but only to keep it for the King's use, whereas on an execution he is bound to sell and has the power to pass the title and by sale does pass it. It was upon the theory that the title had not passed, that restitution of the goods themselves was made in outlawry cases, while restitution of the money only was made in the case of valid sales on execution. In *Charter* v. *Peter,* 2 Cro. Eliz. 597, it was held that

where property had been levied upon but not sold when a *supersedeas* was awarded, and afterwards a *venditioni exponas* was awarded, the defendant was not entitled to be restored to the property, for the reason that execution upon the judgment had been commenced and was to be treated as fully completed upon the theory that execution is an entire thing and cannot be superseded after it has commenced. At first blush, this might be taken to be in conflict with the view that where the sheriff is not compelled to sell and yet does sell he passes no title. But it is to be noticed that the court held that the *supersedeas* had not the legal effect of staying the execution, because it was an entire thing and was to be treated as if it had been completed, although in fact it had not. In *Lessee of Bisbee* v. *Hall,* 3 Ohio 464, an execution was stayed by injunction after a levy on chattels, and the court decided that the sheriff was bound to restore the chattels to the owner. The difference between the two cases is very manifest.

In applying these principles it is necessary, first, to ascertain the relation of the parties to one another and to the court and the *status* of the property. It is almost needless to say that the property was in the custody of the court. It had been levied upon under an execution issuing from the court that made the order of restitution. So far as this record discloses, there was a valid judgment, a valid execution thereon, and a valid levy of the same. A suspending bond had been delivered to the officer by a claimant of the property, and section 4 of chapter 107 of the Code says that, "When such bond is so delivered the sale of the property shall be suspended." From the reading of that section, it is manifest that the mere delivery of such bond operates a suspension of the sale. While it says that the suspension shall be at the instance of the claimant, he is not required by said section to do more than deliver the bond. Such bond effectually stays the execution in the sheriff's hands and he is powerless to sell. A sale thereafter is not only insufficient to pass title, but, if wilfully made, or if made collusively, for the purpose of favoring the execution creditor, it amounts to an abuse by the sheriff of the process of the court and would subject him to punishment for contempt. *McWilliams* v. *King, et al.,* 32 N. J. L. 21; *Hopkins* v. *Sears,* 14 Vt. 494, (39 Am. Dec. 236) ; *O'Donnell* v. *Mullin,* 27 Pa. St. 199, (39 Am. Dec. 458). As he had no power to

pass the title by his sale, of course the creditor obtained none.
As the invalidity of the sale was shown by the papers in the
cause, including the execution in the hands of the sheriff, it re-
quired no extraneous evidence to establish the fact that the pur-
chaser had acquired no title, and was in no better situation than
any other purchaser *pendente lite*. The only procedure neces-
sary therefore, was a rule against him to show cause why he
should not be required to restore the horse to the custody of the
sheriff. In lieu of a rule, a notice was served upon him which
brought him before the court and performed substantially all
the functions of a rule, and then the order of restitution was
made, and at the same time, the sheriff was commanded to take
and bring back into the custody of the court the property which
he had illegally passed out of his hands. The functions of the
court, in respect to the property had not ended, for it was the
duty of the court on the application of the claimant, who had
given the suspending bond, to cause the execution creditor and
the claimant himself to appear before the court, to the end that
their respective claims might be litigated and their rights decided
in the court. Section 5 of chapter 107, of Code. The action
of the sheriff and Gilmer had taken out of the possession of the
court the subject matter of its jurisdiction, and without a shadow
of right of authority. Certainly, the court ought to have as
much power to vindicate its possession as a private individual
has. The right of reclamation of property, without process and
by mere recaption, by the owner from whom it has been illegally
taken, is as old as the law itself. He need not stop to invoke the
aid of the court but may follow up the property and take it him-
self whenever that can be done without committing a breach of
the peace. Chitty Gen. Pr. 130; 3 Blk. Com. 304. "The true
owner of goods wrongfully taken may retake them if he can, even
from a third party, using (it is said) whatever force is reason-
ably necessary." Bouv. Law Dic., T. Recaption.

This order, it must be remembered, is not an adjudication be-
tween parties, but only one in favor of the court against all the
parties. The restoration is not to the defendant or to the claim-
ant, but to the custody of the law, to the end that final adjudica-
tion of the rights of the parties may hereafter be made. By this
order, nobody has been deprived of his property. Nothing is
affected except rights relating to the horse, and the alleged pur-

chaser acquired none in him, as conclusively appeared by the papers in the case when the order was made.  Whatever recourse he may have for his money is upon the sheriff and the plaintiff who made the illegal sale.  By this order the court simply maintains its jurisdiction and vindicates the majesty of the law.

The judgment will be affirmed.

*Affirmed.*