# WHEELING.

KNIGHT, COMMITTEE, &C. *v.* WATTS'S ADM'RS *et al.*

Submitted January 15, 1885.—Decided July 3, 1885.

1. If two executors authorized by the will of their testator to sell a tract of land sell it to one of the executors but convey it to a third party who immediately conveys it to the executor who was the real purchaser, such sale can be avoided at the option of any of the parties, who under the will had an interst in the proceeds of such sale, to the extent of the interest of such devisee so objecting. But such sale and deed is not absolutely void, and the right of any one of the devisees or of all of them may be lost by any facts or circumstances showing that he or they had expressly or impliedly approved such sale under circumstances, that would make such approval a waiver in a court of equity of the right to have such sale and deed set aside. (p. 202.)

2. If a personal representative or other fiduciary fails to make an *ex parte* settlement of his fiduciary accounts once a year, it will be presumed, that such failure arose from the failure of such fiduci-

| 26 | 175 |
| 42 | 459 |
| 42 | 781 |

| 26 | 175 |
| 52 | 565 |

| 26 | 175 |
| 62 | 607 |

ry " to furnish a commissioner with a statement of all the money, which he had received or had become chargeable with or had disbursed within six months after the end of the year," and unless this presumption is rebutted by satisfactory evidence, such fiduciary must forfeit his commissions and all other compensation for his services during the year, in which he fails to have made such *ex parte* settlement. (p. 203.)

3. It is true, that delay in the assertion of a right, unless satisfactorily explained, may operate in equity as a waiver of such right, and that *laches* and neglect are always discountenanced by a court of equity. But these principles are inapplicable, when the party, who, it is claimed, has failed to assert his right in a reasonable time, was an infant or one *non compos mentis*, and the suit is brought promptly, after there is some one appointed, upon whom the law imposes the obligations to guard the interest of such infant or lunatic. (p. 206.)

4. To authorize an investment by a fiduciary under an order of a judge in Confederate bonds the act of the Virginia legislature of March 5, 1863, required, that these conditions should concur : First, The money must be in the hands of the fiduciary. Second, It must have been received in the due exercise of his trust. Third, For some cause he must have been unable to pay it out to the party entitled to it. And if in any case they did not all exist, the fiduciary is responsible for the money. (p. 210.)

5. If it was the duty of trustees to invest the funds of their *cestui que trust*, and it was safely invested and secured amply on land, and these trustees were to collect the money so invested in Confederate notes largely depreciated and should re-invest it in Confederate bonds, which became valueless, such trustees would be responsible to the *cestui que trust* for the amount of such money so improperly collected and re-invested. (p. 211.)

6. A testator devised a sixth of his estate to trustees for the use of his grandson, who was an imbecile, his portion to be held by them and the interest expended annually in his support and education, till he should attain the age of twenty-five years. When this grandson attained the age of twenty-two years, these trustees claiming that they had invested the whole of his estate in a Confederate bond, which was not shown to be true, and having furnished no support for more than a year claiming that they owed nothing, his whole estate being lost by its investment in a Confederate bond, entered into an agreement with him, which he had not sufficient mind to fully comprehend, whereby he in effect released them from responsiblity for the amount, which came into their hands, to an extent exceeding $1,000.00. Such agreement ought not to be held binding on him, and his trustees should be

required to settle their accounts, as if no such agreement had been entered into with him. (p. 211.)

7. Without determining upon what principles the accounts of a committee of a lunatic or idiot should generally be settled, yet it is held that under the circumstances of this case stated in the opinion the accounts of such committee ought to be settled on the principles governing the settlement of a guardian's account. (p. 218.)

GREEN, JUDGE, furnishes the following statement of the case:

Michael Bunger died in Greenbrier county, West Virginia, in 1859, leaving real and personal property worth about $20,000.00. By his will he bequeathed his beds, bedsteads and bedding, and his library of books, to his five daughters and to his grandson, William D. Littlepage, a son of a deceased daughter; and he directed that the share of the bedding belonging to this grandson should be in the charge of the testator's daughter, Nancy Kincaid, and that his portion of the library of books should be held by the testator's executors, or by the guardian of the grandchild, till he arrived at the age of twenty-one years. All his other property, real and personal, he directed his executors to sell and the proceeds after the payment of his debts were to be equally divided among five daughters and this infant grandson after first allowing him $150.00, which was the amount he had advanced to each of his daughters. And this will appoints the testator's two sons-in-law, James D. Kincaid and James F. Watts, trustees to hold the sixth part of his estate devised to his grandson, until he should attain the age of twenty-five, the interest of which should be expended annually in his support and education, or so much as may be necessary, and if he should turn out to be a promising and sprightly youth, and his executors upon consultation and advice with the father of this grandson, should deem it desirable and proper to give him a liberal education, the testator desired that the same should be done out of his portion of the estate under the direction of these two trustees; and the testator appointed his said sons-in-law his executors. This will was probated in September, 1859, in the county court of Greenbrier; and these executors qualified as such, and in October, 1860, on the motion of these ex-

ecutors said county court ordered them to settle their executorial accounts before James Withrow, a commissioner. This settlement was not made till January 1, 1862, some two years and a half after the testator's death.

The first item of this *ex parte* account on the debtor side is cash paid by these executors for the estate, October 27, 1859. The amount of payments made by the executors during the first year on October 27, 1860, was by this report, $945.56; and the amount of receipts during this first year, was $6,271.61, which included $4,618.20, the cash payment on lands of testator sold by the executors. The balance in the hands of the executors at the end of first year, October 27, 1860, was $5,326.05. During the second year the executors paid out only $112.17. They received during this year the whole amount of the bill of sale of property made by them, $4,571.29; and the principle of the land-bond for land of testator sold by them, which fell due on October 27, 1860. After allowing their commissions the balance due from the executors by this account as settled by the *ex parte* settlement at the end of the second year, was principle, $13,943.90, and interest $754.10, as of date October 27, 1861. Between that and January 1, 1862, the cash paid by executors and retained to pay all debts was only $30.81. The cash received by the executors was for amount of last payment on land sold, due October 23, 1861, $4,618.20, and cash received from a debtor of the estate, $48.53; and after allowing commissions the balance in their hands on January 1, 1862, was found by this report to be, principal, $18,610.63, and $1,186.60 of interest, and after deducting from this the $150.00 extra, allowed William D. Littlepage by the will and interest on it from October 27, 1860, ($10.50,) left for equal distribution among six devisees, $18,197.47 of principal, and $1,170.12 interest with interest from January 1, 1862, till paid. The total amount of commissions allowed the executors in this account is $1,006.38. This report states, that the executors represent, that all the debts were paid, and that the estate had then been fully administered and was then ready for final settlement. This report was filed March 26, 1862.

On July 13, 1863, these executors of Michael Bunger, deceased, presented a petition to Hon. Robert Hudson, judge of

the circuit court of Greenbrier county, Virginia, in which
they state, that William D. Littlepage is about fourteen
years of age, and that they have in their hands about $3,100.00
or $3,200.00 to be invested for him, which by the will of
Michael Bunger they as executors and trustees were to hold
till William D. Littlepage attained the age of twenty-five
years, and they asked authority to invest said funds in Con-
federate State stock or such other stocks as the judge should
prefer; and on same day this judge made an order in vaca-
tion whereby leave was given these executors to invest the
money in their hands in their fiduciary character aforesaid
in interest bearing bonds or certificates of the Confenderate
States or of the State of Virginia pursuant to the Virginia
act of March 5, 1863.   On August 4, 1868, these trustees of
Wm. D. Littlepage made an *ex parte* settlement of their account
as trustee before Alexander Walker, commissioner, to which
there were no exceptions filed; and it was confirmed by the
recorder of Greenbrier county on January 9, 1869.   It
showed a balance of interest due to William D. Littlepage
of $26.10 in the hands of his trustees James F. Watts and
James D. Kincaid on August 4, 1868, when William D
Littlepage came of age.   On one side of this account was
placed in one gross sum, the interest on the principal sum
found to be in their hands on January 1, 1862 from that
time to August 4, 1868, that is $1,259.38 and also the in-
terest, which was in their hands by the settlement of January
1, 1862, that is $43.00 ; and on the other side was placed
the commission of five per cent on these two sums amount-
ing to $1,302.44, that is $65.12, and all payments these trus-
tees had made for William D. Littlepage, which amounted
to $1,214.32.   No rests of any sort were made in settling
this trustee-account.   Of this $1,214.32 there is entered as
paid January 1, 1862 $854.32 and $360.00 as of August 4,
1868.

This *ex parte* settlement was made because of a suit, which
had been brought in the circuit court of Greenbrier by Wm.
D. Littlepage by his father and next friend Lewis P. Little-
page on February 16, 1867, when Wm. D. Littlepage was be-
tween the age of nineteen and twenty years of age.   This
suit was brought simply to compel these trustees to pay out

the interest, which accrued on this principle sum found by the settlement of January 1, 1862 to be in the hands of these trustees, it being claimed, that they would not pay out the same, but that while it was accumulating in the hands of. the trustees, accounts for the necessary support of Wm. D. Littlepage were going unpaid. The truth of this was shown by this *ex parte* settlement of August 4, 1868 when Wm. D. Littlepage came of age. It shows that $309.00 was paid out that day by these trustees for him, while nothing had been paid out for him by them for more than six years before that date. They had ceased paying anything out, because they claimed that under this order of the judge of the circuit court of Greenbrier they had invested in the bonds of the Confederate States all of the money of Wm. D. Littlepage in their hands; and that by the result of the war the whole of it both principal and interest had been lost. They filed no answer to this chancery suit, and no steps were taken in the suit, it being dismissed almost immediately after it was brought under an agreement signed by L. P. Littlepage and J. F. Watts dated March 28, 1867 a little over one month after the institution of the suit. This agreement recites, that "Watts and Kincaid, the trustees, are willing, without considering it can be rightfully demanded of them but on the contrary denying that it can be in accordance with law and justice, to pay this interest and such as might accrue up to the time Wm. D. Littlepage arrives at the age of twenty-one years." They accordingly agreed to pay this interest, but without prejudice to their rights thereafter in consideration of this dismissal of this suit, and the *ex parte* settlement made when Wm. D. Littlepage came of age August 4, 1868 shows how this agreement was carried out.

On September 6, 1869, about thirteen months after Wm. D. Littlepage came of age, an agreement was executed by these trustees and by his father and himself, of which the following is a copy :

"Memorandum of an agreement made and entered into this 6th day of September, 1869, between James F. Watts and James D. Kincaid, executors of Michael Bunger, deceased, and trustees (by appointment in said Bunger's will) of Wm. D. Littlepage, of the first part, and Wm. D. Littlepage and

Lewis B. Littlepage, father and next friend of the said Wm. D. Littlepage, of the second part, all of the county of Greenbrier and State of West Virginia:—

"Witnesseth : That, whereas, the said William D. Littlepege was entitled under the provisions of the will of the said Bunger, which share was ascertained by settlement before a commissioner of the late county court to be $3,182.91, and by the will was directed to be held by the executors, as trustees, for the separate use of the said William D. Littlepage until he arrived to the age of twenty-five years, expending the interest annually in his maintenance and education, and whereas the said executors and trustees did in the year —— invest the said amount (or thereabouts) in a bond of the Confederate States for the said William D. Littlepage, which bond is now worthless, the said parties have, and do agree to the following settlement, viz :

"That the said executors shall pay interest on the original amount from the 3d of August, 1868 (the date up to which the interest has been heretofore paid) to the 3d of October, 1869.   That at the last mentioned date the original principal sum shall *abate one-third;* that is, instead of $3,182.91 the principal shall be $2,120.94.   That on the 3d day of October, 1869, the said executors shall pay to the said William D. Littlepage, or his order, the interest before mentioned, amounting to $224.79, and out of the principal the further sum of $121.74, (total $344.73) thus leaving as of the 3d of October, 1869, the principal sum of $2,000.00, which sum is to remain in the hands of the said executors or trustees until the said William D. Littlepage arrives at the age of twenty-five years, they paying to him the interest thereon annually ; and the said parties of the first part hereby agree and bind themselves, their heirs, &c., to pay the said $2,000, with any interest that may be due thereon, to the said William D. Littlepage or his order, so soon as he shall have arrived at the age of twenty-five years.   And the said parties of the second part hereby bind themselves that so soon as the said sum of $2,000.00 and interest thereon shall have been paid, as above mentioned, the said William D. Littlepage shall execute to the said parties of the first part a full receipt and discharge from all further liability on account of the distributive share

of the said William D. Littlepage in the estate of said Michael Bunger, deceased, first above mentioned.

"As witness the *hands and seals of the parties* this, the date first above written.

> "JAMES F. WATTS,        [Seal.]
> "JAMES D. KINCAID,        [Seal.]
> "WM. D. LITTLEPAGE,        [Seal.]
> "L. B. LITTLEPAGE,        [Seal.]

"Teste—JAMES WITHROW, . .

"As to all four of the parties.

"The $344.73 paid in my presence October, 1869."

William D. Littlepage reached the age of twenty-five on August 4, 1873; but shortly before he attained that age, at the April term 1873, after the examination of witnesses the county court of Greenbrier being satisfied, that he was *non compos mentis*, appointed James F. Watts, who was one of his trustees, a committee to take charge of his person and estate both real and personal, and he qualified as such committee giving the required bond and security. Shortly afterwards, on October 20, 1873, James F. Watts, committee of William D. Littlepage, bought for him a tract of land in Greenbrier county of his former co-trustee, James D. Kincaid, containing 115 acres paying therefor $1,550.00; and a deed was then executed conveying said land to James F. Watts as such committee. This tract of land was subsequently, on October 24, 1881, sold and conveyed by him as such committee to Mary C. Gabbert for $1,212.00, of which. $612.00 was to be paid in cash and the residue in five years thereafter with interest from date to be paid annually. This $612.00 was then invested by James F. Watts in the purchase of another tract of land in said county of Joseph H. Holcomb; and on November 8, 1881, Holcomb and wife conveyed this tract of land containing 93¾ acres, to James F. Watts committee of William D. Littlepage. This deed was recorded in the office of the clerk of the county court of Greenbrier.

On April 18, 1882, James Knight, sheriff of Greenbrier county was appointed the committee to take charge of the estate and person of Wm. D. Littlepage, in the place of James F. Watts, deceased; and on the first Monday

in June, 1882, he brought this chancery suit in the circuit court of Greenbrier county, as committee of Wm. D. Littlepage, against A. B. Watts and R. W. Hill, administrators of James F. Watts, deceased, James Knight, administrator *de bonis non*, with the will annexed of James D. Kincaid and his widow, children, devisees and legatees and also the widow and children of James F. Watts, deceased, they being his heirs and distributees. This bill states all of the above facts and surcharges and falsifies the *ex parte* settlement made by a commissioner of the county court on January 1, 1862, hereinbefore set out. The error stated to exist in this account was, "the commissioner had therein charged the estate or credited the executors with the commission on their receipts aggregating the sum of $1,006.38, and which the said executors had no right to claim whatever in consequence of their failure to settle annually, and consequently the amount in favor of said Littlepage, as of January 1, 1862, should have been more by nearly $200.00, than the sum actually reported." The bill also surcharges and falsifies the settlement of August 4, 1868, and alleges the following errors to exist in it:

"First. The account is not stated annually from year to year with annual rests, as should have been done, but the transactions for the whole time, some six or seven years, are thrown together from January 1, 1862, to August 4, 1868, the time included in said settlement.

"Second. The account is not stated as it should have been, that is, as a guardian account with the interest of each year in excess of the disbursements added to the principal and made an interest bearing fund, but it is stated as an administration or executorial account with the exception that it is not stated, as noted above, from year to year with annual rests.

"Third. The trustees are allowed commission on the balance of interest brought over from their executorial account.

"Fourth. They are allowed commission upon the large amount of interest which came into their hands from January 1, 1862, to August 4, 1868.

"Fifth. The account is erroneous in that it allows the said trustees any commission at all ; for even if they were entitled

to commission ordinarily upon interest collected, they had lost and forfeited all such right by their failure to make annual settlement as the law requires.

"Sixth. The trustees are not charged with and render no account of the beds, bedding, &c., bequeathed to their said *cestue que trust* or ward, and,

"Seventh. They are not charged and render no account of his interest in the 'library books' of the said testator."

The bill also surcharges and falsifies the *ex parte* settlement of James F. Watts, trustee and committee of Wm. D. Littlepage, of date January 28, 1876. The errors assigned in this settlement, are as follows :

"First. The account is not stated from year to year with annual rests as the law requires.

"Second. It is not stated, as should have been done, upon the principle of an account between guardian and ward.

"Third. It is erroneous in allowing the committee commissions upon a balance of interest on hand and brought over from his account as trustee when settled by Walker.

"Fourth. It is erroneous in allowing commission upon the interest accrued during the time covered by this settlement.

"Fifth. It is erroneous in allowing commissions upon the sum which the commissioner is pleased to style the ' principal;' this sum was in the hands of the committee when acting as trustee, and is only brought forward in this new account; was not collected by him, and upon it he is entitled to no commissions. The committee admitted to the commissioner (see report) that he had had the whole fund in his hands all the time and that Kincaid, his co-trustee, was in no way responsible except as a surety.

"Sixth. It is erroneous in allowing any commissions at all on any sum, as the committee or trustee by his failure to make annual settlements had forfeited his right to the same.

"Seventh. It is erroneous in allowing the committee credit for the item of $344.73 paid over to Littlepage in person on October 4, 1869. (See voucher four with report and what is said above as to this item when speaking of the " closing executorial" account of March 12, 1870, and which is here reiterated.)

"Eighth. It is erroneous in allowing the committee credit

or an abatement for $1,060.97 as of October 4, 1869, by reason of an alleged investment in Confederate bonds and a pretended agreement between the trustees and Littlepage and his father as *next* friend. (See as to this error what is said above in speaking of it in connection with the " closing executorial" settlement of March 12, 1870, and which is here reported.)

"Ninth. It is erroneous in that it allows the committee credit for $1,550, the price of a tract of land said to have been bought by him for Littlepage as of October 24, 1873; this land the plaintiff alleges was bought without any right or authority on the part of said committee so to do, at a most unreasonable and exhorbitant price ; was bought from Kincaid, a co-trustee, and was only bought to enable him to account for and make good a large amount due from him to the trust fund and to relieve himself from liability therefor, and—

"Tenth. It is erroneous in not charging the committee with the rents and profits of the land thus bought, and in utterly disregarding and taking no account of said rents whatever.

"Eleventh. Said account is erroneous in crediting the committee with a large number of disbursements, whereby he expended a large part of the *principal* of the fund in his hands improperly and without any authority."

The bill then proceeds as follows :

"The plaintiff also alleges that some seven or eight years after said land was purchased, the said Watts, without any power or authority so to do, without any application to the court or any direction from it, sold said real estate at a great loss and sacrifice, only getting therefor some $1,212.00, although it cost the estate of said Littlepage $1,550.00 as above mentioned, and for this loss and sacrifice the plaintiff is advised and charges the estate of said Watts, committee, and his sureties on his bond as such, are liable.

"And further the plaintiff is informed, believes and charges that the said Watts, committee as aforesaid, well knowing of course the mental infirmity and imbecility of said Littlepage, and his consequent inability to manage and control his property properly, utterly failed and neglected to manage and con-

trol the same or even to supervise its management, but left the whole control and management without any action or interest on his part to said Littlepage himself, by which cause the said property and estate were grossly mismanaged, squandered and almost entirely lost. And for this loss the plaintiff is advised and charges the estate of said Watts and his sureties on his bond as committee are liable.

"The plaintiff further represents that these matters would have been seen to and the relief now asked would have been sought sooner, but the persons against whom it is asked were, themselves, the executors of Bunger and the trustees and committee for Littlepage, and were alone authorized to act for him, and of course would not do so to their own loss and injury; that the said Littlepage as already stated is and always has been "*non compos mentis*" and powerless to act for himself. And the plaintiff is advised that under the circumstances he can not be barred of his remedy and relief by any statute of limitations and can not be prejudiced by the lapse of time."

The prayer of this bill is as follows:

" In consideration of the premises, the plaintiff prays that the parties named as such in the caption may be made parties-defendant to this bill and required to answer the same fully; that the defendants, the administrators of James D. Kincaid and of James F. Watts, may be required, before one of the commissioners of the court, to make a statement and settlement of the transactions of their said intestates as executors of the will of Michael Bunger, deceased, showing what assets came to their hands, and what disbursements were by them made, at least so far as necessary to show the amount that was due from them to W. D. Littlepage as a legatee in said will or his trustees, and also to make a statement and settlement of the transactions of their interests as the trustees of said Littlepage appointed by said will; that the said administrators of James F. Watts may be required before said commissioners to make a statement and settlement of the transactions of their said intestate as committee for said Littlepage, and that they be also required to render an account of their own transactions as administrators upon the estate of their said intestate, showing what assets have come or should have come to their hands, what disbursements have been by

them made, and what balance, if any, is due to or from his
said estate; that upon the taking of said accounts the said
plaintiff may have lieve to surcharge and falsify the excecuto-
rial account of January, 1862, the trustee account of Novem-
ber, 1868, the executorial account of March 12, 1870, and the
trustee and committee account of January, 1876, in the fore-
going bill mentioned, as to the alleged errors and matters
therein stated and pointed out, and as to such other matters
as may be by him brought to the attention of said commis-
sioner; that the so-called closing executorial account of
March 12, 1870, in said bill mentioned, may, as to himself as
committee for said Littlepage and as to said Littlepage, be
amended, set aside, and held for naught; that for such an
amount as may appear, upon such settlement, by said com-
missioner, to be due him, he may have a decree against the
estates of the said James F. Watts, James D. Kincaid, and
against the said sureties of said Watts as committee, jointly
or severally as they may be liable; that the creditors of said
Watts may be convened and required to prove their debts be-
fore said commissioner in the manner prescribed by law.
And that he may have all other further, general and complete
relief."

The infant children of James F. Watts by their guardian
*ad litem*, filed their answer, a formal one, to the bill, which was
replied to generally. His administrators also filed their
answers. They deny that their intestate was responsible for
the beds, &c., and library which the will specifically be-
queathed, and which never came into the hands of the execu-
tor, and say that the library consisted of only five religious
books and pictorial histories and patent office reports worth
a few dollars at most. They deny that William D. Little-
page was ever an idiot, though he was always of weak intel-
lect they admit, yet he had capacity enough to marry and
raise children and to manage his farm and to attend to his
affairs generally in many matters exhibiting, they say, much
shrewdness and good judgment, though on account of his
weak intellect he could not manage his estate prudently and
therefore his relatives had a committee appointed for him in
1873. They claim that there has been gross *laches* in the in-
stitution of this suit, and that by reason of the statute of limi-

tations and the rules governing courts of equity no relief can be granted the plaintiff after the death of parties fully cognizant of the facts; and they set up this as a bar to the plaintiff's claim. They claim that it was the custom of commissioner Withrow, who made the settlement of the accounts of the executors of Michael Bunger up to January 1, 1862, to make up the settlement not when vouchers were filed by the executors, but he often retained them till long after the expiration of the year, in which they were filed, if by so doing he could make up substantially a final settlement of the estate; and that their intestate filed their vouchers before this commissioner in proper time, and he delayed the settlement in order to make substantially a final settlement, and in it he therefore properly allowed the commissioners their full commissions. They say that " the balance found to be in the hands of the executors of Michael Bunger, January 1, 1862, due to William D. Littlepage was made up in part of Confederate money and in the vicissitudes of the times—owing to the moral compulsion to take Confederate money and the inability of the parties to make satisfactory investments in good paying securities—it all soon passed into that currency. Under these circumstances the executors made the application to Judge R. M. Hudson for leave to invest said funds in Confederate bonds, and by his leave said investment was made accordingly, but the Confederate bonds by the result of the war became utterly worthless."

Their answers further say, that these executors refused therefore to account for this fund or its interest, and the suit aforesaid was brought by Wm. D. Littlepage by his father and next friend, which was compromised, so far as the interest was concerned, as hereinbefore stated; and that Wm. D. Littlepage though then an infant knew of this and consented to it; that in accordance with this settlement the commissioner made the settlement of November 1868; that a change in the decision of the court having been made or foreshadowed, the parties made the final settlement, before referred to of September 6, 1869. They also say that this suit was purposely kept on the docket till after September 6, 1869, and then dismissed; that shortly afterwards commissioner Withrow made his final *ex parte* settlement which .

was in accordance with these agreements. They deny "that the purchase by James F. Watts of the tract of land for $1,550.00 was without right or authority on his part as committee so to do. They admit that it was afterwards sold for $1,212.00, but this was done at the urgent request of W. D. Littlepage and his wife." It was necessary to sell this land for the support of Wm. D. Littlepage. And these answers conclude as follows: "Respondents say, that said Watts gave such superintendence to said lands and affairs of said Wm. D. Littlepage, as they needed, for nothing more was needed than to guard him against improvidence. The said Littlepage being abundantly able to take care of himself in at least all minor affairs, such as the control and management of his land, and that said Littlepage received the full benefit of the use and profits of said lands, and no part thereof was either lost, misapplied or squandered, as alleged."

These answers were replied to generally. Many depositions were taken and with the exhibits filed in the cause. They proved the facts hereinbefore stated as existing prior to the filing of the bill in this cause. They proved also, that the bed, bedding and library of books were divided, as directed by the will, and the portions left to Wm. D. Littlepage were left to his aunt, Nancy Kincaid, and at Wm. D. Littlepage arriving at twenty-one years of age delivered to him. She was the wife of James D. Kincaid, who was one of the executors of Michael Bunger. Commissioner Withrow proves, that he did, as stated in the answer, frequently retain vouchers filed with him by executors for a considerable time, and if filed within the proper time he frequently retained them without making a settlement within the time required by law, if by so retaining them he could make one final settlement of the whole estate at the end of two years. He says that in this cause "he is unable to say that the executors of Michael Bunger did file their papers before him before the expiration of eighteen months, but he was inclined to think they did, because one of the executors did consult him a great deal about the estate, and he frequently prepared papers for him." But he further stated that he had no recollection of these papers being filed by these executors

within the eighteen months; and that he acted as commissioner during the late war, and that the county court of Greenbrier frequently sat during the war. It was proven that Wm. D. Littlepage was married in 1871 or 1872, when he was twenty-four or twenty-five years of age, and when this suit was instituted, he had four or five children. He was about nine years old when his grandfather Michael Bunger wrote his will. He was born August 4, 1847. When at school he was very dull. He tried to study reading, spelling, writing and arithmetic but he made a very poor out in studying them. He was put into geography but he could not learn it and he gave it up. His mind did not improve any as he grew old. It always remained about the same. He was contrary; his speech and manners singular; he stammered and laughed a great deal. When a boy he engaged in sports with other boys. He was a soldier in the Confederate army. He did attend afterwards generally to the business on his farm such as having fences put up and buying calves and the like. He in such matters traded and did business of this sort as well as others, though he was sometimes loose in such business transactions. He was not an idiot but was a boy and man of weak mind; and though the evidence is to some extent contradictory, yet the weight of the evidence is, that he did not have sufficient strength of mind to transact any business of much importance. His wife was not satisfied to live on the tract of 115 acres which his committee, Watts, first bought for him, and because of this he sold it and bought the second farm. His committee bought this 115 acres at a fair price and afterwards sold it at a fair price. He got less for it than he gave for it, partly because it had depreciated in value under the management of Wm. D. Littlepage, and partly because there had been a general depreciation in value of land in Greenbrier county. The committee, Watts, gave but a reasonable price in the opinion of the witnesses for the second tract of land. Watts was solicited by Wm. D. Littlepage and by his father to qualify as the committee ; and upon testimony taken before the county court of Greenbrier that court appointed him such committee. Commissioner Withrow was one of the witnesses on whose testimony Watts was appointed the commit-

tee of W. D. Littlepage. The agreement signed by the executors of Michael Bunger and by the father of Wm. D. Littlepage and by him, dated September 6, 1869, when he was about twenty-two years of age was witnessed by James Withrow, the commissioner, who states that this compromise and its terms were principally made by Wm. D. Littlepage's father, but Wm. D. Littlepage participated in it to some extent, but he can not remember to what extent. He talked about it some; but his father was the principal negotiator on his side.

A decree was entered on June 29, 1882, referring the cause to a commissioner, with instructions to take, state and report the following matters and accounts, viz.:

"First. A statement and settlement of the transactions of James F. Watts and James D. Kincaid, as executors of the will of Michael Bunger, showing what assets came or should have come to their hands, and what disbursements were by them made, at least so far as may be necessary to ascertain and show the amounts to which Wm. D. Littlepage was entitled as a legatee under said will.

"Second. A statement and settlement of an account of the transactions of James F. Watts and James D. Kincaid, as trustees appointed by said will for said Littlepage.

"Third. A statement and settlement of an account of the transaction of James F. Watts, as committee for said Littlepage.

And leave was given the plaintiff to surcharge and falsify the *ex parte* settlement in the bill mentioned, of the executorial account of January, 1862, the trustee account of November, 1868, and the trustee and committee account of January, 1876, and the executorial account of March 12, 1870, as to the matters and errors alleged and pointed out, and as to such other matters as may by him be brought to the attention of your commissioner, and

"Fourth. An account and settlement of the transactions of the defendants, A. B. Watts and R. W. Hill, as admisistrators of James F. Watts, showing what assets have come or should have come into their hands, what disbursements have been by them made, and what balance, if any, is due to or from said estate; and

"Fifth. Any other matter deemed pertinent by your commissioner, or required by any party to be specially stated."

On April 9, 1883, commissioner McWhorter made his report, and in it after reviewing the facts proven, he reaches the following conclusions:

"First.—On the question of allowing the executors of M. Bunger commission on the amount received, your commissioner is disposed to allow the executors their commission for the reason stated; that it was probably more the fault of the commissioner than of the executors that the annual settlements were not made. The executors started the matter in time by having the same referred to a commissioner for settlement. The commissioner cannot say but what their papers were placed in his hands at the proper time to save their commissions, and the executors are both dead, so they can make no statement in regard to it.

"(There is one further settlement not yet referred to styled the 'closing executorial settlement.' The settlement of 1862 was a final settlement. So your commissioner is unable to exactly understand its object, unless it is to show how the executors stood as to some of the legatees mentioned.)

"Second.—As to the investment of the fund of their *cestui que trust* by the trustees, and the subsequent agreement between Littlepage after he became of age, and with his father as his next friend, and the trustees, is a question of importance.

"This fund for Wm. D. Littlepage arose principally from the sale of the land of his grandfather, purchased by one of the executors and a trustee, and when the purchase-money became due it was but Watts, the purchaser, paying it to Watts, the trustee. All within one person. When due, the money had the full or par value of gold. It is not probable, at all, that when due, the money was set apart and kept in kind for the *cestui que trust.* When the money, circulating as a medium of currency, had so depreciated in value as that a dollar was worth only 1-10 of a dollar per face value, and, consequently, very abundant, the trustees petitioned the court to allow them to fund it in Confederate bonds, and an order was made granting leave to thus invest it.

"A court of conscience can not sanction such a course.

Uuder the decisions iu 25 Grat., *Crickard's executors* v. *Crickard's legatees*, and in 14 W. Va., *McClure, Adm'r* v. *Johnson et al.*, which are nearly parallel cases to the one under consideration, the investment was not sustained, and in the latter case in the syllabus the quere is raised : 'Can an investment in Confederate bonds by a fiduciary be upheld under any circumstances.'   Were there no other complication connected with this case but the question of investment, under the authorities cited, there would be no difficulty in deciding it. But after the young man attained his majority, and with the counsel and advice of his father, as his next friend, he entered into a contract abating one-third of the principal.   The trustees were to keep the fund four years longer, before he could be permitted to have his money, and by that time, under an examination by the county court, he was adjudged *non compos mentis.*   The proof, by deposition of witnesses, shows that at the time the court determined his condition, he was in no worse condition, mentally, than he had been from the time he was grown.   And, indeed, there was no necessity of bringing the matter before the court to determine his condition prior to this, for his funds were in the hands of trustees, who were directed how to use it by the will of the testator, M. Bunger.

"A query arises here in •the mind of your commissioner, viz : This fund being in the hands of trustees, under directions how to apply it or the proceeds of it, could the young man, even if his sanity was unquestioned, make any contract in reference to the disposition of the principal.

"His father, as his next friend, could not, in a legal sense, make any disposition of it.   His action might affect the moral aspect of the case, but no further.

"Defendant's counsel refer as authority of law to 'Ordromax on judicial aspects of insanity'—pp. 317, 318, 319, 320, 331 and 332—now ignore the query suggested above, and say that the young man was entitled to the possession of his money when he entered into the contract of 1869.   Even were there no doubts as to his sanity, was not the relation of the parties such that upon application to a court of conscience, the plaintiff on the ground of being overreached in the transaction might reasonably ask to have the contract set aside and

annulled. The first passage of law, referred to above, page 317, is specially applicable to the plaintiff's case. The paragraph is quoted at length :—

" 'These are cases of peculiar hardship, when a court of equity will set aside an improvident agreement made by a person in whom the mind and memory are so impaired as to justify this protection *quoad hoc,* and yet when the court would not have the power to deprive such person of the right to the possession and control of his property, on the supposition that he was a person of unsound mind.' And this is added : 'But irrespective of fraud and an unconscionable bargain, mere weakness and partial incapacity, will not afford ground for the interposition of courts.'

" 'And it has been held that a conveyance by one, whose mind without being actually unsound, is yet impaired, will not be set aside when the consideration was fair, and no fraud practiced.'

"This shows that courts of equity will set aside improvident contracts in peculiar cases, when the state of the mind would not authorize the court to appoint a committee for the party, and thus deprive him of the control of his property.

"Now the latter part of the above quoted paragraph is particularly applicable in this case, for in view of the decisions referred to in Grat. and W. Va. Reports :—

"The investment by the fiduciary can not be sanctioned by court, and must be held void. Hence there was over $3,000.00 due the said Littlepage, January 1, 1862. And this contract by which he abates one-third of the amount is without a fair consideration, and therefore unconscionable. Your commissioner can come to no other conclusion than that the abatement should be charged up against the estate of J. F. Watts, deceased.

"As to the credit or payment to William D. Littlepage of $344.73, on October 4, 1869, $222.79 was interest. And it was in the discretion of the trustee, if deemed necessary for the said Littlepage's welfare to pay the same. And to that extent the credit should be allowed. In the settlement of the trustee account in the sum found due January 1, 1869, from that date down to August 4, 1868, when William D. Littlepage became twenty-one years of age, the statement

first made as the proper one is settled on the principle of a guardian account, and it seemed to be the correct principle on which it should be stated. Sec. 10, ch. 82 of the Code seems to warrant the statement. Stating it in that way, and then settling the committee account on the principle of debtor and creditor, allowing of the $344.73 as a credit the interest included therein, and allowing no commission in the trustee account nor the committee account, as such actual settlements as required by the statute were not made, and charging the abatement of one third of the sum found due January 1, 1862, and bringing the account down to April 1, 1883, there is due to the plaintiff, as of that date, $2,963.35. As to the manner of stating the trustee account, settling it on the principle of guardian accounts, your commissioner is not entirely convinced of its correctness. And should the court take the view that it should be run through both accounts as debtor and creditor account, the calculation has been made, and the result placed at the foot of the statement in figures of red ink, showing due the plaintiff of same date $2,417.05. Other statements are made and carried out to meet the views of the respective parties. And each statement headed by an explanation as clear as it is deemed necessary to a proper understanding of the account stated.

"As to the loss on the sale of the land, your commissioner is not disposed to charge that to the estate of Watts, as it may have occurred by reason of a shrinkage in the value of real estate between the dates of the purchase and the sale."

Then follows a statement of what will be due from the executors of Michael Bunger to the committee of William D. Littlepage because of the allowing to these executors commissions in the *ex parte* settlement of January 1, 1862, should it be held they were entitled to no commission because of their delay in making this settlement. The one sixth of these commissions and the interest thereon to April 1, 1883 is shown to be $384.15. Next follows a statement showing the amount due William D. Littlepage's committee by restating the account of April 24, 1869, between James F. Watts and James D. Kincaid, executors and trustees, and William D. Littlepage and settling the same on the rules of settling accounts between guardian and ward, and starting with the

amount, which would have been due, had no commissions been allowed these executors in the first settlement January 1, 1862. This account so stated shows a balance due on August 4, 1868, when William D. Littlepage came of age, of $3,696.22 all principal. The account is then carried on upon the principles laid down by James Withrow, the commissioner, taking this sum of $3,696.22 as a basis and allowing no abatement as per agreement of September 6, 1869, and allowing no credit of $344.73 named in said agreement and paid to William D. Littlepage, and allowing no commission, and giving credit for the purchase of the 115 acres of land for $1,550.00, but charging the committee of William D. Littlepage with the loss on the resale of this land. The balance due to the committee of William D. Littlepage from this account as of April 1, 1873, is $4,922.97; and, if the bond executed to James F. Watts as committee of William D. Littlepage for the purchase of the second tract of land is transferred to the present committee of William D. Littlepage as an investment, said land and interest amounting to $651.70, the balance due James Knight committee of William D. Littlepage as of April 1, 1883 will be $4,271.27.

At the request of the plaintiff's counsel the commissioner made out a statement on the foregoing principles, except that the trustee and committee was not allowed any credit for the price of the 115 acres of land bought of Kincaid for $1,550.00. The balance due the plaintiff by this statement as of April 1, 1883 was $6,113.77; and if this be adopted, the second tract of land purchased for William D. Littlepage and now occupied by him would belong to the estate of James F. Watts, his committee, as also the $600.00 bond due on the sale of the first tract of land. If commissioner Withrow's views in his *ex parte* settlements are adopted, and the account is brought down to April 1, 1883, there will be due to the present committee of William D. Littlepage $34.34. The Commissioner then makes a statement which he regards as just. The following are the principles on which it is based :

"In the first place, for reasons already stated, the executors of Bunger are allowed commissions.

"In the next place, the trustees not having made their annual settlements, are not allowed commission in the settle-

ment of their trustee account, and said account for reasons given is stated on the same principles as guardian accounts are stated. No abatement is made on account of the investment in Confederate bonds. The trustees having been directed by M. Bunger's will to hold the fund in trust until the *cestui que trust* should arrive at twenty-five years of age, the payment of any of the principal before that date was a violation of their trust, unless it had been determined in the manner indicated in the will to educate said beneficiary. Therefore none of the principal which entered into the credit of $344.73 should be allowed as a credit, but only the interest, constituting a part of the said sum, viz.: $222.79 should be credited ; and lastly, as the annual accounts or settlements were not made, no commission is allowed."

By this statement the balance due August 4, 1868, when W. D. Littlepage came of age, would be $3,351.60. The account is then carried on upon the principles adopted by James Withrow, commissioner, allowing no abatement for the money funded in Confederate bonds, as per agreement of September 6, 1869, and allowing of the credit of $344.74, paid W. D. Littlepage only such sum as appears to be interest, that is, $222.79. The balance due by this settlement as of April 1, 1883, is $2,963.35, if the $600.00 bond dated October 24, 1881, given by the purchaser Mary D. Gilbert, to James F. Watts, committee of Wm. D. Littlepage, is regarded as belonging now to James Knight as committee of W. D. Littlepage. If the trustees' account was settled on the principle of debtor and creditor accounts, the balance due to the plaintiff, when settled in the same way, instead of $2,963.35, would be as of April 1, 1883, $2,417.05. The settlement of the accounts of A. B. Watts and R. W. Hill, administrator of James F. Watts, shows a balance due then to the estate of $4,363.61. The debts due from the estate of James F. Watts, other than the debts due the committee of Wm. D. Littlepage, are $4,922.54.

Eleven exceptions were filed by the plaintiff's counsel to this report, as follows :

"First.—To the allowance of credit to the executors of Michael Bunger, of commissions on receipts.

"Second.—To the allowance in one of the statements of

commissions to Watts and Kincaid, in the settlement of their accounts as trustees of W. D. Littlepage.

"Third.—To the allowance in the statement of commissions to James F. Watts as committee of W. D. Littlepage.

"Fourth.—To the settlement in certain of the statements of the accounts of James F. Watts as trustee of William D. Littlepage upon the principles of *debtor* and *creditor* instead of upon the principles of *guardian* and *ward.*

"Fifth.—To a like error in the settlement of one of the accounts of James F. Watts as committee of William D. Littlepage.

"Sixth.—To the allowance of James F. Watts committee of a credit of $1,550.00 for land of his co-trustee James D. Kincaid purchased by him for William D. Littlepage.

"Seventh.—If this could at all be allowed then it would be error not to charge this committee with the difference between what he gave for this land and what he sold for without authority.

"Eighth.—In not charging this committee with the rent of this land nor with interest on the amount paid for it and yet allowing credits for disbursements for groceries, store-goods, clothing, potatoes, grain and supplies of every kind bought by him for William D. Littlepage.

"Ninth.—In allowing credit for a large number of disbursements *made by this committee on his own authority* whereby he diminished the *principal* in his hands some $150.00.

"Tenth.—In the allowance to the said committee of the credits of $343.73 or any part thereof paid by him on October 3, 1869, under the agreement of September 6, 1869.

"Eleventh.—To the allowance to the committee or trustees of William D. Littlepage of the abatement of $1,000.00 under this agreement of September 6, 1869, because of alleged investments in Confederate bonds."

The defendants also filed twelve exceptions to this report.

"First.—Because the settled accounts of James F. Watts whether as executor or as committee were *prima facie* correct and could only be surcharged and falsified in the particulars named in the bill and on proof which was never furnished.

"Second.—That the accounts ought not to have been settled on the principles of settling the accounts of *guardian* and

*ward*, but on the principles applicable to the settlement or. executors' accounts till their accounts as executors ought to have been closed, and from that period to August 4, 1873, when W. D. Littlepage arrived at the age of twenty-five, on the principles applicable to trustees, and after that to the death of James F. Watts on the principles applicable to a committee's accounts.

" Third.—Because the commissioner could not pass on the capacity of William D. Littlepage to make the agreement of September 6, 1869, and if he could he and the court should have held it a binding contract.

" Fourth.—Because commissions should at least have been allowed on receipts during latter periods of the war when no settlement could have been made.

"Fifth.—Because annual rests were made throughout almost the entire fiduciary period in years in which there were no receipts or disbursements for no other apparent reason than to compound interest and disallow commissions. And commissions should at any rate have been allowed on receipts for eighteen months prior to each settlement.

" Sixth.—Because the report does not state facts but is an agreement in favor of the plaintiff.

" Seventh.—Because the accounts are brought down to a period subsequent to the death of James F. Watts.

" Eighth.—Because in one of the statements the calculations are brought down to 1868 and the amount thus ascertained carried back to January 1, 1862, and made the basis of the settlement from the last period and the year 1868 is broken into two parts with no apparent purpose than to compound interest again.

" Ninth.—Because one of the statements does not allow the credit for $344.73 paid to William D. Littlepage under the agreement of September 6, 1869, because it charges Watts with the loss resulting from the sale of land bought for William D. Littlepage, and because the $600.00 due on the land for which a bond was in the hands of Watts as committee was not treated as an investment as of the time it was taken but deducted at the end of the account.

"Tenth.—Because in one of the statements Watts is not given credit for investments made by him in land.

"Eleventh.—Because in one of the statements, Watts is not given credit for the $344.73 paid at the time of the settlement of 1869. All of this credit should have been allowed as the payment was made in accordance with the views of the testator declared in the will, and

" Twelfth.—The account which purports to give the results of the accounts if settled on the principle of *debtor* and *creditor* is excepted to because the result given is erroneous."

A reply was made by the plaintiff to each of these exceptions ; but as they were only arguments, it is deemed unnecessary to state them. The court on April 26, 1883, rendered the following decree :

" The subpœnas in this cause having been returned executed, and all the defendants, except the infants and the administrators of James F. Watts, still failing to appear and answer the plaintiff's bill as to the defendants not answering is taken for confessed. And this cause having been regularly matured and set down for hearing at rules, came on this day, April 26, 1883, to be heard upon the subpœnas returned executed, and the bill taken for confessed as aforesaid, the answers of the infant defendants, and of the administrators of James F. Watts, deceased, the demurrer and answer of the said administrators to the plaintiff's bill, as amended before appearance on the part of any of the defendants, joinder in said demurrer and general replications to said answers, the interlocutory order entered at the June term, 1882, the report of commissioner McWhorter, made in pursuance of said order, the exceptions to said report by the plaintiff and by the defendants, the administrators of James F. Watts, exhibits filed, depositions and the arguments of counsel. Upon consideration thereof the court is of opinion and decides that the plaintiff, committee for W. D. Littlepage, is entitled to recover from the estate of James F. Watts as the first preferred debt, the sum of $1,919.21 with interest thereon from May 13, 1882, the date of the writ in this suit, which amounts as of April 1, 1883, the time to which the calculations in said report of commissioner McWhorter are conducted to the sum of $2,020.13 and his costs in this suit; that he is also entitled to the bond of $600.00 with its accrued interest, executed by

Gabbart, in payment of the Spring Creek land, and that the investment made by said Watts on the land on Muddy creek, conveyed to him by Holcomb and wife in the proceedings in this cause mentioned, was a proper investment. And that the said plaintiff, committee as aforesaid, should keep and hold said land for the benefit of said Littlepage. And it is therefore adjudged, ordered and decreed accordingly, and that the report of commissioner McWhorter be thus modified and all statements in said report, as well as all exceptions thereto inconsistent with this result, are hereby overruled.

"And it appearing further from said report that the following parties are entitled to recover from the estate of James F. Watts, deceased, as non-preferred debts the following sums respectively, all as of April 1, 1883, viz: Ann Skeen, $688.08; Frank McClung, $417.38; G. W. Price, $108.83; A. B. Watts, $645.00; and that all of said debts, including the amount allowed the plaintiff as aforesaid, amount, as of April 1, 1883, to the sum of $3,879.92, and that there is a personal fund in the hands of the said administrators of said Watts sufficient to pay the same, it is therefore adjudged, ordered and decreed that the general receiver of this court recover from the said administrators of James F. Watts the said sum of $2,020.13 due the plaintiff, with interest thereon from April 1, 1883, and the costs of the plaintiff.

"And that the other said creditors recover from the said defendants, the administrators of James F. Watts, the said sum due them respectively as aforesaid, with interest thereon from April 1, 1883, until paid, their costs in this suit expended. And when the said sum decreed him shall have been collected, the said receiver shall apply the said money to the payment of said costs, and pay out the balance to the plaintiff. And it is further adjudged, ordered and decreed that the said administrators of James F. Watts turn over and surrender to plaintiff the said Gabbert bond with its accrued interest upon his executing and delivering to them a proper receipt therefor, and that the said plaintiff take and hold the said tract of land on Muddy creek for the use and benefit of the said W. D. Littlepage."

From this decree an appeal was allowed to James Knight, committee of W. D. Littlepage, the plaintiff below.

*A. F. Mathews*, for appellant.

*J. W. Harris*, for appellees.

GREEN, JUDGE :

The clearest mode of determining the numerous legal questions necessary to be decided in order to determine the decree, which should be entered by this Court in this cause, it seems to me, is to consider in their order the legal errors, which have been committed by James F. Watts and John D. Kincaid as executors of Michael Bunger and as trustees of William D. Littlepage, and also those committed by James F. Watts as committee of William D. Littlepage, and the effect, which such errors ought to have produced in the settlement of the accounts of these executors and trustees and of the said committee.

The first error committed by these executors was made on December 5, 1859, within less than three months after they qualified as such executors, in that they improperly sold to James F. Watts, one of the executors of Michael Bunger, deceased, a tract of land of 774 acres in Greenbrier county for the sum of $13,854.60. By the will the executors were directed to sell this tract of land. But they committed an obvious breach of their trust as executors, when they sold it to one of themselves. No person can consistently occupy the two positions of seller and purchaser. Of course the fact that they as executors of Michael Bunger conveyed this tract of land to one Samuel B. McClintic, who on the same day conveyed it to James F. Watts, one of the executors, does not in the least degree change the case. For it is admitted that James F. Watts, one of the executors, was the purchaser, and that it was conveyed to Samuel D. McClintic and by him to James F. Watts as a mode of transferring the title from the executors to James F. Watts one of the executors. Their mode of transacting this business only shows, that they were unconscious that they were doing any wrong or committing any breach of trust in selling a farm of their intestate to one of their own number. But that it was a breach of trust is indisputable. In the case of *Newcomb, et al* v. *Brooks, et al*, 16 W. Va. 33 point 7 of syllabus, this Court decided : "When there are several fiduciaries one can not purchase of

the others, but such a purchase can be avoided at the option of the parties to whom such fiduciary relation is held. Any one of the persons, to whom such fiduciary relation is held may avoid such a purchase so far as his interest is concerned, though all the others standing in the same relation to the fiduciaries are content that the same shall stand." On pages 70 and 71 very many authorities are cited to sustain this proposition, and it must be regarded as unquestionably law.

Any one of the children of Michael Bunger had a perfect right, had he or she chosen, to have this sale set aside, so far as his or her interest in the land was concerned, and so had Wm. D. Littlepage his grandson or his committee; but none of them have chosen to do so, and the sale was not void but only voidable. The bill in this cause does not ask to have this sale, so far as the interest of Wm. D. Littlepage in the land is concerned, set aside, but on the contrary it is throughout the pleadings and all the proceedings in this cause treated as a valid sale. It must therefore be regarded as such; and this error of the executors of Michael Bunger can therefore have no effect upon any of the settlements of the accounts of any of the fiduciaries in this cause. The next error committed by the executors of Michael Bunger is, that they did not comply with the law which required them "to furnish a statement of all the money, which they had received or become chargeable with or had disbursed within one year from the date of the order conferring their authority or within any succeeding year together with the vouchers for such disbursements within six months after the end of every such year to a commissioner of the court wherein the order was made conferring their authority." (Code of Virginia ch. 132 sec. 7.) And the law fixed a penalty for a failure to perform their duty in this respect, the penalty being if they "should wholly fail to lay before such commissioner a statement of receipts for any year within six months after its expiration, they should have no compensation whatever for their services during said year" with certain exceptions not necessary to be stated, as they have no application to the case we are considering. (Code of Virginia ch. 132 sec. 8.)

It is claimed however by the appellee's counsel that the

executors of Michael Bunger did not fail for eighteen months, after they qualified as such, that is after the September term 1859 ·of the county court of Greenbrier, to produce their vouchers before a commissioner of said court for a settlement of their executorial accounts; and this is supposed to be shown first by the fact, that about thirteen months after they qualified these executors caused on their motion the county court of Greenbrier to make the order of October 22, 1860, directing their executorial accounts to be referred to James Withrow commissioner for settlement, and that it is reasonable to suppose, that they produced their vouchers before him for settlement within five months thereafter, especially as he testified that he was in the habit, even when the vouchers of a personal representative were produced before him within six months after the expiration of the first year, of postponing the settlement for two years after the qualification of the personal representative, if he thought a full and final settlement could then be made—and he was inclined to think that was done in this case, but this opinion was based on no recollection of this as a fact but simply on his habit in such cases and on the fact, that one of the executors, he remembers, frequently consulted him about the estate.

. On the other hand it appears, that commissioner Withrow's first report was not made till after January 1, 1862, that is, till more than twenty-seven months after these executors qualified, and in his report it does not appear, when he commenced the settlement of this account, or when the executors first laid before him their vouchers for such settlement. Under these circumstances under the statute-law above referred to these executors would be entitled to no compensation for any services rendered during the first year after they qualified, that is, before some time probably about September 22, 1860.

The account shows, that the whole amount received by the executors during this first year was $6,271.61, the commission on which at five per cent. was $313.58 which ought not to have been allowed these executors, it having been forfeited under the statute above quoted. But commissioner Withrow properly allowed the executors their commissions for the second year and for three months thereafter up to January 1, 1862, as their vouchers, on which this first settlement was

based, must have been filed with the commissioner within less than six months after the close of the second year, for the settlement was completed before that time. Commissioner McWhorter in the settlement made in this cause allowed these executors commission not only for the second year but for the first year also; because, he says, " it was probably more the fault of commissioner Withrow than of the executors, that the annual settlements were not made. The executors stated the matter in time by having the same referred to a commissioner for settlement. The commissioner can not now say but that their papers were placed in the hands of commissioner Withrow at the proper time to save their commissions, and the executors are both dead, so that they can make no statement in regard to it."

In this he erred. It was the object of secs. 7 and 8 of ch. 132 of the Code of Virginia to have an *ex parte* settlement of the accounts of fiduciaries made once a year. If such settlement once a year was not made, and it resulted from the failure of the fiduciary "to furnish a commissioner with a statement of all the money, which he had received or become chargeable with or had disbursed within one year from the date of the order confirming his authority, within six months after the end of the year, then he is to have no compensation whatever for his services during this past year." If no such settlement is made as required, the presumption must be, that it arose from the failure of the fiduciary to furnish in proper time this statement and his vouchers, and he must show satisfactorily, that he did in fact furnish such statement and vouchers to the commissioner. If he shows this, the failure of the commissioner to make up and return his settlement till after the expiration of the second year would under these sections of the Code of Virginia not forfeit his commission. But unless he does show, that he furnished this statement and his vouchers within eighteen months, then he forfeits his commissions on the amounts received during the past year.

Did the executors of Michael Bunger show satisfactorily, that they furnished this statement and their vouchers to commissioner Withrow within eighteen months after they qualified? It seems to me they did not. It is true, they had

had an order made by the county court of Greenbrier county, at the October term, 1864, directing them to settle their accounts before commissioner Withrow. This order was made only thirteen months after they qualified. But it seems to me to furnish but very weak evidence, that they submitted their vouchers to commissioner Withrow within eighteen months after they qualified. There was no sort of necessity for the making of any such order. They could as well have submitted their vouchers to commissioner Withrow for settlement without having such an order made as after the making of it; and the obtaining of this unless order can have certainly very little weight in deciding, when in point of fact they did submit their vouchers to commissioner Withrow. The only other evidence tending in any degree to show, that in point of fact they submitted their vouchers to commissioner Withrow within eighteen months after their qualification as such executors, is that of commissioner Withrow, who testifies, that he has no recollection, when it was done, but thinks it probable, it was done in proper time, as one of them frequently asked his advice, and he was in the habit, when vouchers were submitted to him in proper time, to put off the settling of the accounts until the expiration of the second year, if by so doing he could make one final settlement instead of two settlements. This, it seems to me, is insufficient to prove, that these vouchers were produced before him within eighteen months after the qualification of these executors. All that it proves is, that perhaps they were and perhaps they were not; and as the burden of proving, that they were, was on the executors, they have failed to meet this burden, and the commissions on their receipts for the first year were forfeited and ought not to have been allowed to them.

Under the circumstances of this case I attach but little importance in reaching a conclusion on this point to the fact, that this suit was not instituted till more than twenty years after the settlement of the *ex parte* account by the executors and until after the death of both of the executors. It is true that delay in the assertion of a right, unless satisfactorily explained, operates in equity as evidence of assent, acquiescence or waiver; and *laches* and neglect are always discountenanced

by a court of equity. (*Trader* v. *Jarvis*, 23 W. Va. 108; *Pusey* v. *Gardner*, 21 W. Va. 469; *Doggett* v. *Helmn*, 17 Grat. 96.) Now, while it is true, that a suit could have been brought at any time by the next friend of Littlepage to surcharge and falsify this *ex parte* settlement of the executors because of the allowance of this commission, (*Bird's Committee* v. *Bird*, 21 Grat. 712,) yet an infant or lunatic ought not to be prejudiced because of the failure of a next friend to institute such a suit, if such suit is brought promptly after there is some one, upon whom the law imposes the obligation to guard the interest of the infant or lunatic. In this cause the suit was brought promptly after the appointment of the plaintiff as committee of William D. Littlepage. These facts account satisfactorily for the delay in the institution of this suit.

The amount of the commissions improperly allowed the executors was $313.58, and the interest on this from the close of the first year, October 27, 1860 till January 1, 1862, when the executorial account was finally closed, is $12.75, making the error in this first account of commissions in favor of the executors $326.33. And as William D. Littlepage was entitled to one sixth of this amount, the true amount due him on January 1, 1862, by these executors principal and interest was $3,442.82 instead of $3,388.43, according to the account of the commissioner. From this is to be deducted the amount paid out for the tuition and other expenses of Littlepage up to January 1, 1862, amounting to $162.46, leaving a balance of $3,280.36 as the true amount, which on January 1, 1862 went in to the hands of James F. Watts and J. D. Kincaid as trustees of W. D. Littlepage.

In making this statement I have corrected no error in commissioner Withrow's account except the improper allowance of commissions to the executors, as no other error was insisted on in the argument of counsel. The other errors claimed in the petition were trifling in amount, (if they really were errors, which they were not. It was no error in commissioner Withrow not to charge these executors with the beds, bedsteads, bedding and library mentioned in the will.) They were bequeathed by the will to testator's daughters and William D. Littlepage; and the evidence shows, that Wil-

liam D. Littlepage received in kind his one sixth of these articles. These trustees of Littlepage having in their hands this sum of $3,280.36 on January 1, 1862, instead of making annual settlement before a commissioner, as required by law, made no settlement at all till August 4, 1868, when Littlepage arrived at the age of twenty-one years. On the principles we have laid down they were entitled to no commissions in this settlement made before commissioner Walker, except a commission of 5 per cent. on the interest received by them shortly prior to August 4, 1868. This amount does not distinctly appear, but we may assume it to have been interest on the sum of $3,280.36, which was in their hands, for the year 1867 and up to August 4, 1868, a little over nineteen months, or $14.02 instead of $65.12, the amount of commissions allowed them by commissioner Walker. In allowing this commission for receipt of interest from January 1, 1877, I assume that these trustees presented their vouchers to the commissioner within eighteen months after January 1, 1867, that is before July 1, 1868, which is in a high degree probable, as the account was closed about a month after that time.

This account shows, that these trustees between January 1, 1862, and August 4, 1868, that is, for five years and seven months, spent for the education and maintainance of William D. Littlepage including commissioner's fees for settling the accounts $13.75 and taxes, which amounted to $58.22, $1,208.22. The interest on the funds in the hands of the trustees amounted during this time to $1,286.82. So that the interest on the funds in the hands of the trustees just about compensates the trustees and pays for the tuition and maintenance of Littlepage leaving his principal undiminished. The true balance in the hands of these trustees on August 4, 1868 was the original principal sum, which came into their hands January 1, 1862, that is, $3,280.36 and $93.64 of interest. Commissioner Walker reports the amount in their hands at that time as $26.00. The difference is to be accounted for by the fact that commissioner Walker allowed, as I have shown, too much commission to the trustees by $40.20, and did not charge them with sufficient interest, having charged them with the interest on $3,182.91 only, which was the principal in the hands of the executors for Littlepage, when their exe-

cutorial accounts were closed, January 1, 1862. But there was in the hands of these executors for Littlepage $43.06 interest, and when it passed from these executors to them as trustees, all of it should be regarded as principal; and therefore the true amount of principal in their hands was even according to commissioner Withrow's account $43.00 more than commissioner Walker calculated interest upon. But I have shown, that there was an error in commissioner Withrow's account arising from allowing the executors too much commission, and that the true balance against them in favor of Littlepage was $3,280.36. Calculating the interest on this instead of on $3,182.91, as commissioner Walker did, would make a difference in the interest charged against these trustees of $27.44.

On September 6, 1869, these trustees and William D. Littlepage and his father L. B. Littlepage executed an agreement under their hands and seals, which was regarded by commissioner Withrow as binding on the parties in the next settlement of James F. Watts as trustee and committee of William D. Littlepage, of date January 28, 1876. Did he err in treating this agreement as binding? On July 13, 1863, James F. Watts and James D. Kincaid, executors of Michael Bunger, presented an *ex parte* petition to Robert Hudson, the judge of Greenbrier county, Virginia. In this petition they simply set out that Michael Bunger by his will had appointed them executors of his will and also trustees for Wm. D. Littlepage " to hold the fund given him, until he should attain the age of twenty-five years, the interest to be expended upon his education; that he was, they thought, about fourteen years of age, and they found it impossible to make any productive investment of the capital coming to him upon good security except in government stocks; that they had on hand $3,100.00 or $3,200.00 to be invested; and they asked an order authorizing them to invest said funds in Confederate stocks or such other public stock as the judge might prefer." The judge in vacation entered an order on July 13, 1863, whereby he gave them leave " to invest the money in their hands in their fiduciary character in interest-bearing bonds or certificates of the Confederate States or of the State of Virginia." There is no proof that any such investment in

their fiduciary character was ever made; but if there had been it would not have varied the case.

In the case of *Crickard, Executor* v. *Crickard's Legatees*, 25 Grat. 410, approved by this Court in *McClure, Administrator* v. *Johnson et al.*, 14 W. Va. 448 it was decided, " that to authorize an investment by a fiduciary under an order of a judge in Confederate bonds, the act of the Virginia Legislature of March 5, 1863, required that these three conditions should concur: First. The money must be in the hands of the fiduciary. Second. It must have been received in the due exercise of his trust. Third. For some cause he must be unable to pay it over to the party entitled to it; and if they do not all exist, the order of the court or judge is null, and the fiduciary is responsible for the money."

In this case it is clear that neither condition one nor condition two existed; and this *ex parte* order of Judge Hudson was null and void. First, there were no Confederate notes or any other money in the hands of these fiduciaries belonging to Wm. D. Littlepage. And second, if it is possible to regard any Confederate notes or other money which they then had as having been received by them as executors of Michael Bunger or as trustees of W. D. Littlepage, then such Confederate notes were clearly received not in the due exercise of their trust but in clear violation of their duty as trustees. To show that this must be so, it is only necessary to state the facts briefly. These trustees were James F. Watts and James D. Kincaid; if they ever did receive this money at all, they received it from James F. Watts as the price of a tract of land, which was improperly sold by them to him. And the account, which they settled, showed that they received the whole of this money on or prior to October 27, 1861. It is not even pretended that the identical money received by them had been kept on hand, some of it for more than two years, and all of it for nearly two years, when they applied for leave to invest it in Confederate bonds. I presume the truth is that in point of fact this money was not collected by these trustees of James F. Watts either in Confederate notes or in any other sort of money. It was due from him to the trustees, no sort of money having been paid. It was simply charged up to the trustees, as if it had been

paid, one of them being responsible for it.  But clearly so much of this money as belonged to William D. Littlepage ought not to have been collected by these trustees; for when collected it was the duty of the trustees to at once lend it out; and if, as they say in this petition, they could not safely lend it out, why did they collect it, when it was already in the hands of James F. Watts and most amply secured by being a lien on a tract of 774 acres of land worth more than $13,000.00?  If any money was ever invested by these trustees in their name as trustees of William D. Littlepage, of which there is no proof, the investment must have been of Confederate notes of James F. Watts individually, and it was only a means of saving himself from loss by reason of the depreciation of Confederate money of his own in his hands, and imposing this loss upon William D. Littlepage.

His counsel does not contend, that under the authorities we have citted James F. Watts and James D. Kincaid had any authority by virtue of this order of Judge Hudson to make any investment in Confederate bonds, and admits that they would despite this order be bound to account for all the money of Wm. D. Littlepage that might come into their hands.  But it is claimed that this was a subject of controversy in 1869, and that Wm. D. Littlepage, on September 6, 1869, when he was more than twenty-two years of age, agreed, as a compromise, that because of this loss by reason of the depreciation of Confederate bonds and their ultimately becoming valueless, Wm. D. Littlepage would abate of the principal *one-third* of his demand against his trustees, Watts and Kincaid, and that they should pay interest on the full amount of what was due only up to October 3, 1869, at which time the principal was to be thus abated.  Was this a valid contract?  There was certainly no consideration to sustain such an agreement, unless we are to regard this abatement as a compromise between Wm. D. Littlepage and his trustees of a controversy existing between them and him at that time. They claimed, that they were under no obligation to pay to him any part of the funds, which had come into their hands as trustees under the will of Michael Bunger, and it was, their counsel claimed, agreed, that they would pay two thirds of the principal which had come into their hands, and all

the interest, if he would surrender his claim to any more, and by this agreement he assented to this proposition. Now what were the relations of the parties to each other, when this compromise is claimed to have been made? They occupied towards him the relation of trustees and had charge and control of all ot his property, and they refused to pay anything to him for his support. In this agreement it is recited, that they as executors of Michael Bunger and as his trustees had invested about the amount they owed him in a bond of the Confederate States for Wm. D. Littlepage. There is no proof that any such investment was ever made by them as trustees of Wm. D. Littlepage, or even in their own names, except that contained on the face of this agreement, which was of course information given by them. Now in point of fact all the funds ot Wm. D. Littlepage were safely invested on an indebtedness of James D. Watts, perfectly secured on a farm of 744 acres, worth twice the amount of the fund due to W. D. Littlepage. This indebtedness of Watts had been simply charged up as an indebtedness of these trustees, which they claimed they had discharged by this investment, which they made in a Confederate bond long afterwards, when a Confederate bond could have been procured at a very small fraction of its nominal value, they having greatly depreciated before the investment is pretended to have been made.

It is very questionable upon the principles laid down in *Newcomb et al.* v. *Brooks et al.*, 16 W. Va. 32, whether such an agreement as that between these trustees and their *cestui que trust*, made while this relation existed between them, could be sustained, even had the *cestui que trust* been one who was in all respects capable to enter into any sort of contract with third persons. It certainly could not be upheld, unless he was made perfectly aware of all the facts by his trustees, before he made the contract with them. Such dealings between trustees and their *cestui que trust* would certainly be scrutinized by a court of equity and could not be sustained unless it was accompanied with *uberrima fides*. But in this case, it seems to me, a court of equity would not hesitate to regard this agreement as voidable at the pleasure of William D. Littlepage. His grandfather by his will, written when William D.

Litllepage was about nine years old, provided, that all his property should be under the control and management of trustees, till he should attain the age of twenty-five years. This provision was made, because the boy was weak of mind. The will provided, that the interest of what was in their hands, or so much thereof as was necessary, should be paid out by his trustees for his support and education annually. The will further provided, " that in case he should turn out a *promising and sprightly* youth, then he should be given a liberal education out of his portion of the estate." This shows, that, though the child was of weak mind, his grandfather had hopes, that he would improve and become a *promising and sprightly* youth, and if this should fortunately be the case he wished him to be liberally educated, even though a portion of the principal of his estate had to be expended in giving him this liberal education. But it turned out, that his mind remained always weak, and he remained a remarkably dull and weak boy incapable of learning even geography, and his education was necessarily confined to reading, writing and arithmetic, which he learned with difficulty. While not an idiot he was very weak minded, and, when he grew up, was incapable of understanding or attending to any business of importance, or which was at all complicated. This agreement of September 6, 1869, I am satisfied from the evidence, was a character of business far too complicated and important for him to understand; and that this was the view of these trustees is obvious on the face of the agreement. It was obviously for this reason, that they made not only him but his father a party to this agreement. He was then twenty-two years old, and his father would have had nothing more to do with this agreement than any other stranger, had not these trustees felt, that William D. Littlepage had not himself sufficient mind to render him capable of understanding this agreement and was mentally incapable of executing it. This was obviously the reason for making his father a party and procuring his approval. But his approval could give no validity to the agreement, which the trustees felt would otherwise be invalid.

After making this agreement these trustees continued to manage the estate of William D. Littlepage because of

his imbecility, till he arrived at the age of twenty-five years, that is, till August 4, 1872, and in less than a year thereafter at the April term, 1873, the county court of Greenbrier being satisfied upon evidence, that William D. Littlepage was *non compos mentis,* James F. Watts one of these trustees was appointed his committee to take charge of his person and estate, and he accepted the position. As the evidence is clear, that his mind did not grow either better or worse, what stronger evidence of his incapacity to make this agreement could be furnished than this act of one of his trustees, a party to this agreement. This agreement, was I think, clearly not binding upon him; and commissioner Withrow, who was a witness to it and knew the circumstances, under which it was executed, erred when in his settlement of January 28, 1870, of the accounts of James F. Watts, trustee and committee of Wm. D. Littlepage, he treated this agreement as binding on him. This account should have been settled just as though this agreement had never been executed by Wm. D. Littlepage. The accounts were settled with Watts alone as trustee, because, the commissioner states in this report, Watts admitted that all the funds of Wm. D. Littlepage were at all times in his hands, and he did not claim that his intestate, James D. Kincaid, was responsible for any portion of the estate of Wm. D. Littlepage, unless it was as his security because of his having been co-trustee with him, Watts.

This account was erroneous not only in this and in assuming the settlement made by Commissioner Walker to be correct, but also in allowing James F. Watts, trustee and committee, a commission on all moneys received by him, which had not been allowed in previous accounts, though he had settled no account for eight years. The account is brought up to October 24, 1875. The report having been made January 28, 1876. But before returning this report it was continued till February 21, 1876; and in this additional report he allowed to James F. Watts commission on the principal sum, $2,000.00, under this agreement, that is to say $100.00. There should have been, upon the principles we have laid down, no commission allowed to James F. Watts, except on his receipts during a period of not more than eighteen months

prior to October 24, 1875. The commission on these receipts would have been only $9.00. All the rest of his commissions are forfeited, because of his utter failure without excuse to present his vouchers to a commissioner for settlement once a year. The commissions actually allowed him in this account amounted to $140.77.

But there were other and more serious errors in this report. It allows to James F. Watts, as committee of W. D. Littlepage, a credit of $1,550.00 cash paid to James D. Kincaid for a tract of land bought of him for W. D. Littlepage, and conveyed October 20, 1873, to James F. Watts, committee of W. D. Littlepage. Now as there was no authority ever obtained of any court for this committee to make this investment of the funds of W. D. Littlepage, an idiot, in real estate, Watts as such committee had no authority to purchase this tract of land. It can not be regarded therefore as a purchase by him as committee of W. D. Littlepage, but must be regarded as a purchase by him individually; and he ought not to have been allowed this credit of $1,550.00. I deem it unnecessary to make further comment on this *ex parte* report. The purchase of this land by James F. Watts, as committee of W. D. Littlepage, of his former co-trustee for $1,550.00, without any authority from any court to make such purchase and his subsequent sale and conveyance of this tract of land without any authority from any court to Mary C. Gabbert for $1,212.00 taken in connection with his, Watts's purchase of his testator's tract of land of 774 acres of his co-executor said J. D. Kincaid, indicate a total disregard of his duties as a fiduciary, while his purchase of this 774 acres was, as we have seen, not absolutely void, but only voidable, his purchase of this tract of Kincaid in his capacity of committee of W. D. Littlepage was absolutely void, so far as it purported to invest the funds of W. D. Littlepage in this land; and it could only be operative as a purchase by himself as an individual. This tract of land being thus his individually, upon the re-sale of it to Mary C. Gabbert he became entitled to the whole of the purchase-money individually, and whatever part he did not collect, his personal representatives on his death became entitled to and are still entitled to, if it has not been paid.

We have seen, that the true balance in the hands of James

F. Watts and James D. Kincaid, trustees for Wm. D. Little-page, on August 4, 1868, was $3,280.31, of principal, and $93.64, of interest, the principal being the same as on January 1, 1862, and that they expended in his support and education somewhat less than the interest on his capital in their hands. The report of commissioner McWhorter in this cause shows, that between August 4, 1868, and the time when James F. Watts qualified as committee of W. D. Little-page, the April term of the county court of Greenbrier county, 1873, there was paid out by the trustees to and for W. D. Littlepage, $725.89. The interest on the principal in their hands, $3,280.36 during that time, from August 4, 1868, to say April 4, 1873, would be $918.50, to which add the interest in their hands, August 4, 1868, $93.64, and the total amount which went into the hands of James F. Watts, committee, would be $4,292.50, less $725.89, or $3,566.61, all of which must of course be treated as principal. It is admitted, that whatever was coming to W. D. Littlepage at any time was in the hands of James F. Watts; none of it being at any time in the hands of his co-trustee, Kincaid, and hence the balance due from these trustees April, 1873, $3,566.61, was the true amount, which then came into the hands of James F. Watts, committee, shortly after said Watts had sold to Mary C. Gab-bert the tract of 115 acres, which he as such committee had purchased as a residence for W. D. Littlepage and his family, without authority he purchased as such committee of Joseph F. Holcomb another small farm in Greenbrier county containing 93¾ acres for the residence of Littlepage and his family. He paid for this farm $612.00 ; and a deed was made to him as such committee for said farm on November 8, 1881. He had no authority from any court to invest any money in his hands as such committee in this or in any other land ; and in the settlement of his accounts as such committee he can be allowed no credit for this $612.00 so paid. But he should be allowed a credit for the amount of a fair rent of both the farms while they were occupied by Littlepage.

The changes, which according to the views I have expressed must be made in the report of commissioner McWhorter, are so numerous and fundamental, that I deem it much better to set aside all his reports and reverse the decree of April

26, 1883, based upon them, and remand the cause to the circuit court of Greenbrier with directions to proceed with it according to the principles laid down in this opinion, and instead of expressing an opinion and acting on each of the exceptions to his account to give some additional instructions to be followed in settling the accounts of James F. Watts committee of William D. Littlepage, when the case shall be again in the circuit court of Greenbrier to be further proceeded with.

This account of said Watts, committee of Littlepage, should not be mixed up with the accounts of said Watts and and J. D. Kincaid, executors of Michael Bunger, nor with the accounts of said Watts and Kincaid, trustees of Littlepage; but the account of Watts, committee of Littlepage should commence on the day he qualified as such committee, and on that day he should be charged with $3,566.61 received from the trustees of Littlepage, or more correctly speaking with the amount, which was in his hands or came into his hands at the time he qualified as such committee. This amount when calculated on the principles we have laid down, as it must be, is believed to be $3,566.61 but it may be that some error may on the principles on which we have laid down have been made in these figures, and if so, and it can be pointed out to the court below, it should be corrected, but the principles we have laid down must be strictly followed in ascertaining this amount. In making this settlement the committee is not to be allowed or credited with any commission or compensation of any sort for any services rendered by him except a commission on moneys received by him as such committee between July 28, 1875, and January 28, 1876, when he settled the only account he ever settled as such committee, all his other commissions being forfeited. The committee should be allowed no credit for the $1,550.00 paid to James D. Kincaid for the 115 acres purchased for William D. Littlepage or for the $612.00 paid to Holcomb for the 93¾ acres of land purchased of him for William D. Littlepage, these purchases having been unauthorized. But these two tracts of land must be treated as bought and sold by James F. Watts individually, and therefore, they being his lands, he is to be credited with the reasonable rent of said lands during the time

they were occupied and used by said William D. Littlepage. As from the report of commissioner McWhorter in this cause it is obvious, that James F. Watts as committee of William D. Littlepage never made any legal investment of any of the funds of William D. Littlepage in his hands, and that after crediting him with the rents of the lands of James F. Watts during the time Littlepage had the use of them and also with all payments made to Littlepage or to others for the support and maintenance of him and his family the funds in his hands increased, he spending including these reasonable rents less than the interest on the capital of William D. Littlepage, in the settlement of the accounts of James F. Watts as committee they should be settled on the principles of a guardian's account. The accounts are not always to be settled on the principles on which a guardian's account is to be settled; but under the circumstances shown to exist in this case they ought to be so settled.

Under the circumstances which actually existed in the case of *Bird's Com.* v. *Bird,* 21 Grat. 712, the Court properly decided, that the accounts of the committee were not to be settled on the principles of a guardian's account. The Court in that case expressly based its action in this respect on the particular circumstances of that case.

In the case of *Crigler's Committee* v. *Alexander's Executor,* 33 Grat. 681, *et seq.,* Judge Staples discusses the manner, in which the accounts of committees should be settled. He says :

" The next question is, whether in stating and settling the accounts of the intestate as committee he is to be charged with compound interest upon the balance in his hands. It is insisted this ought to be done by analogy to the rule governing in the settlement of guardians' accounts. It is sufficient to say that the liability of guardians for compound interest grows out of the peculiar provisions of our statutes on that subject. See Code of 1873, § 10, ch. 124, and *Garrett* v. *Carr,* 1 Rob. R. 196.

" These provisions have never been considered as applying to other trustees.

" The accounts of a committee of an insane person are to be settled upon principles governing in the settlement of accounts of other fiduciaries having the control of trust-funds.

They are not chargeable with compound interest except under very peculiar circumstances. When there is an express trust for accumulating, and the trustee instead of investing retains the funds in his own hands, or when he employs the money in his own business and refuses to account for the profits, he may be charged with compound interest or as a measure of damages for undiscovered profits. See 1 Perry on Trusts, secs. 470–474; *Barney* v. *Sanders*, 16 How. 535; Hill on Trustees 571, note.

"Much of the reasoning of Judge Allen in *Garrett* v. *Carr*, (1 Rob. 196) will apply as well to committees of insane persons as to guardians, and would seem to indicate that in some instances all classes of trustees, except executors and administrators, may be chargeable with compound interest even upon a mere failure to invest. See page 215.

"All that can be said therefore is, that no inflexible rule can be laid down on the subject which would apply to all cases. Generally it is conceded that a trustee and other fiduciaries, except a guardian, are liable for single interest only. This doctrine seems to be settled by a great variety of authorities English and American. 1 Perry on Trusts, secs. 470–474; *Barney* v. *Saunders*, 16 How. 535; Hill on Trustees 571, note."

In that case, as the unexpended balances in the hands of the trustee were generally small sums; and it did not appear, that he derived any profit from them, and it was regarded as a case of mere neglect to invest the money, he was therefore held under these circumstances chargeable only with single interest.

In this case the *ex parte* reports in the record and the report of commissioner McWhorter together with the evidence show, that William D. Littlepage and his family needed all the interest on his capital to support himself and his family, and that it was not all expended in such support by a good deal. The whole amount of expenditures by James F. Watts while acting as committee in the support of William D. Littlepage and his family was less than $350.00 in cash in ten years. This with the use of a very small quantity of land was all that was furnished by said Watts to said Littlepage and his family for their support. Something over $70.00 was

credited for taxes paid.  Most of this was, I presume, paid
for taxes on land not owned by Littlepage, but which really,
as we have seen, belonged to James F. Watts individually.
Whatever taxes were paid on these two tracts of land should
not be allowed as credits to James F. Watts, committee, in the
settling of his accounts; nor should any credits be allowed
him for cash paid for the drawing of the deeds for said land
or for recording them.  I can not of course say what the
rents of lands were worth, the use of which was furnished by
Watts to Littlepage and his family; but it is evident from the
prices paid for them that such rents and the average of some
$35.00 a year paid in cash was a very meagre support of Little-
page and his family; and as there was interest in the hands of
the committee to have furnished them a better support; and as
the whole of this interest after retaining for himself a fair
rent for the lands, the use of which he furnished to Little-
page, ought to have been expended in the support of Little-
page and his family; and as this was not done, but a portion
of the interest was retained in the hands of the committee, it
seems to me clear, that on this state of facts he ought to be
charged with interest on the balance of interest, which was
in his hands from year to year, that is, with compound
interest, as in the settlement of a guardian's account, if we
regard the law governing the subject as correctly laid down in
the above quotation from Judge Staple's opinion. I am not pre-
pared to say, that he has stated the law in all respects cor-
rectly; but I am prepared to say, that the law can not be re-
garded as more liberal to committees in their settlements
than it is stated by him; and indeed my impression is, that
the law as he states it, is too liberal to committees, and that
there is a difference in some instances between the principles,
on which their settlement should be made and that of some
other trustees, and that in some cases committees would be
charged with compound interest, as a guardian would be, when
under similar circumstances some other trustees would not be so
charged.  But I do not deem it necessary in this case to ex-
press any opinion as to how the accounts of committees of
lunatics should generally be settled, whether on the princi-
ples governing the settlement of guardians' accounts or not
The circumstances we have pointed out in this case justify

and require us even on the law as laid down by Judge Staples above to direct that the accounts of James F. Watts, as committee, should be settled upon the principles of a guardian's account. Of course no commissions should be allowed Watts as committee, they having been forfeited by his failure to settle his accounts as such committee.

As it is obvious that his estate will upon the settlement to be made under the principles laid down in this opinion be indebted to the present committee of William D. Littlepage in an amount considerably greater than that ascertained by the decree of the circuit court of Greenbrier, it is obvious, that this decree was prejudicial to the appellant, and that he is entitled to his costs in this Court.

The decree of the circuit court of Greenbrier county of April 26, 1883, must be set aside, reversed and annulled, and the appellant must recover of the appellees, A. B. Watts and R. W. Hill, administrators of James F. Watts deceased, his costs in this Court expended ; and this case must be remanded to the circuit court of Greenbrier county to have taken all the proper accounts in this cause, and to proceed further with this cause according to the principles laid down in this opinion and further according to the principles governing courts of equity.

REVERSED.    REMANDED.